THOMAS J. LEGER AND MARGARET H. LEGER, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Leger v. Commissioner
Docket No. 18640-84.
United States Tax Court
T.C. Memo 1987-146; 1987 Tax Ct. Memo LEXIS 142; 53 T.C.M. (CCH) 384; T.C.M. (RIA) 87146; March 18, 1987. Jules Ritholz,Elliot Silverman,Herman Schwartzman, and Howard L. Mann, for the petitioners. Andrew M. Winkler and Jillena A. Warner, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: This case was assigned to and heard by Special Trial Judge Joan Seitz *145 Pate pursuant to section 7456(d) [redesignated as sec. 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755] and Rules 180, 181 and 183. [2] The Court agrees with and adopts the Special Trial Judge's opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PATE, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income tax of $24,140.75 for 1979 and $46,260.02 [3] for 1980. In determining these deficiencies, respondent alleged that petitioners improperly claimed losses and an investment credit arising from their participation in Literary Arts Associates (hereinafter "Arts"), a limited partnership involved in the book publishing industry. Respondent subsequently determined that petitioners had improperly claimed on their 1980 Federal income tax return other losses and investment credits passed through from entities not involved in this opinion, and also alleged that petitioners were liable under *146 section 6621 for increased interest on the deficiency for both 1979 and 1980 resulting from their participation in Arts as well as the other entities. [4] All issues relating to petitioners' participation in Arts during 1979 were tried, [5] and are the subject of this opinion. The issues for our decision are: (1) Whether Arts' publishing activities constituted activities not engaged in for profit within the meaning of section 183; [6] and (2) Whether petitioners' participation in Arts constituted a tax motivated transaction subjecting the deficiency resulting therefrom to an increased rate of interest under section 6621(d). [7]
*147 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Introduction
Thomas J. Leger (hereinafter "petitioner") and Margaret H. Leger, [8] husband and wife, filed a joint Federal income tax return for 1979. Petitioner was a professional accountant and business consultant producing a substantial (six figure) annual earned income therefrom. In 1979, petitioner purchased, for $15,000, one-third of a limited partnership unit in Arts. Arts was organized on July 23, 1979 by Jonathan T. Bromwell & Associates, Inc. (hereinafter "Bromwell"), [9] its general partner, to acquire and exploit mass market paperback books. [10] Bromwell sold twenty-five limited partnership units in Arts at $45,000 cash per unit for a total of $1,125,000. *148 Subsequently, Arts acquired, for a total purchase price of $12,319,000 ($824,000 in cash and $11,495,000 in nonrecourse notes), certain rights and properties associated with the following 23 books (hereinafter "titles") [11] from Madison Library, Inc. (hereinafter "Madison"): [12]
TITLE
1.
The Wilderness Seekers
2.
The Mountain Breed
3.
The Conestoga People
4.
Hearts Divided
5.
Rose of Fury, Rose of Flame
6.
Meteorite Track 291
7.
The Tapestry
8.
Tara of the Twilight
9.
Benediction
10.
Another Love, Another Time
11.
The Sin
12.
What Price Love
13.
Without Sin Among You
14.
Shadow Game
15.
Chrysalis 5
16.
You'll Die Today
17.
The Final Fair
18.
Death in a Small World
19.
The Sandcastle Murder
20.
Murder by the Book
21.
You'll Be the Death of Me
22.
The Whispering Cat Mystery
23.
Who Killed Me?
All 23 titles were produced from original manuscripts, none were reprints. [13] They included 4 historical fiction, 2 historical romance, 3 contemporary romance, 2 science fiction, *149 1 fantasy, 2 thrillers, 1 romantic mystery and 8 mystery puzzlers. All were written by professional authors. The four historical fiction (titles 1-4) were the first titles in the "Making of America" series. This series attempted to capitalize on the popularity of three novels, written by John Jakes and James Michener, which had sold millions of copies. However, neither Jakes nor Michener wrote any of the novels in the Making of America series. The 8 mystery puzzlers (titles 16-23) were numbers 21 through 28 of a series. As an innovative feature, each mystery puzzler contained a sealed final chapter giving the solution to the mystery. This provided the reader with an opportunity to solve the mystery before finding out "who done it." The Transactions Involved
Between November 1978 and January 1979 the authors of titles 1-5 sold exclusive rights to print, publish, license and sell their works [14] to James A. Bryans Books (hereinafter "Bryans Books"). The latest delivery dates for these works ranged between December 31, 1978 and April 1, 1979. As consideration, the authors received *150 advances totaling $42,000; no single advance exceeded $10,000. [15] In addition, each author was entitled to royalties at the rate of 6 percent of net retail sales on the first 150,000 copies sold and 8 percent on all additional copies sold thereafter. On March 29, 1979, Bryans Books assigned all of its rights in titles 1-5 to Richard Gallen & Co., Inc. (hereinafter "Gallen") for an interest in profits. On November 17, 1977, the author of title 6 sold his rights to GM Publishing, Inc. This work was deliverable by March 31, 1978. As consideration, the author received a $5,000 advance plus the right to royalties of 6 percent of net retail sales on the first 150,000 copies and 8 percent thereafter. This agreement also was subsequently assigned to Gallen. [16] Hereinafter titles 1-6 will be referred to collectively as the "Gallen titles." By agreements dated between *151 July 26, 1978 and April 2, 1979 the authors of titles 7-23 sold exclusive rights to license, manufacture, print, publish and distribute their works to Kensington Publishing Corp. (hereinafter "Kensington"), with deadlines ranging between January 1, 1979 and April 15, 1979. As consideration, the authors received advances ranging between $1,500 and $7,500 [17] and totaling $43,500. The agreement for title 11 provided for the payment of a royalty at the rate of 8 percent on the net retail sales on the first 150,000 copies sold and 10 percent on all additional copies sold thereafter. Each of the other authors were entitled to royalties based on the net retail sales of his work, at the rate of 6 percent on the first 150,000 copies sold and 8 percent on all additional copies sold thereafter. The agreements also obligated Kensington to publish 10,000 copies of each title on or before dates ranging between March 31, 1980 and December 30, 1981. Hereinafter titles 7-23 will be referred to collectively as the "Kensington titles." [18]
*152 Early in 1979, Cohen, as president of Madison, negotiated with Gallen and Kensington to purchase the 23 titles subsequently acquired by Arts. From the titles Gallen and Kensington intended to publish, Cohen "cherry-picked" the ones he wanted based on the expected initial printing, a synopsis of the story, a biography of the author, and evaluations by people familiar with the industry. He read only one of the works. By agreement dated March 28, 1979, Madison purchased from Gallen and Kensington the "physical properties" for each title [19] together with the right to print, publish, distribute and sell each title in paperback form. [20]Gallen and Kensington retained their obligations to the authors under their respective contracts. *153 As consideration for the transfer of the Gallen titles, Madison agreed to pay Gallen $73,000 in cash (a down payment of $6,500 plus $66,500 by December 31, 1979) and to execute a separate nonnegotiable, nonrecourse promissory note for each title, all due by October 1, 1988 and totaling $5,525,000. [21] As consideration for the transfer of the Kensington titles, Madison agreed to pay Kensington $91,000 in cash by December 31, 1979 and to execute and deliver a separate nonnegotiable, nonrecourse promissory note for each title, all due on October 1, 1988 and totaling $5,970,000. [22] If Madison failed to make the cash payments required under the agreements by December 31, 1979 all the transferred properties and rights would revert back to Gallen and Kensington without further liability on Madison's part. The notes, dated March 28, 1979, and carrying a 6 percent interest, were payable semi-annually from 60 percent of the gross *154 proceeds [23] derived from sales. [24] However, no interest or principal payments were required from an initial amount of proceeds (hereinafter "guaranteed proceeds") which ranged from $20,000 to $40,000 for the Gallen titles and from $6,000 to $17,000 for the Kensington titles. In a separate security agreement for each note, Madison conveyed to Gallen or Kensington, as appropriate, its rights in the related title. In the event of default, forfeiture of the rights to the transferred properties was the sole remedy available to the sellers. On March 28, 1979, Madison also entered into services agreements with Confucian Press, Inc., a subsidiary of Gallen, (hereinafter "Confucian"), and Hercules Service Corporation, an affiliate of Kensington, (hereinafter "Hercules"), in which Confucian and Hercules agreed to produce, print, bind, distribute, sell and promote paperback editions of the 23 titles for 9 years. [25] The contracts guaranteed that a specified minimum number of copies (between *155 35,000 and 200,000) [26] of each title would be printed before the end of 1979 (hereinafter the "guaranteed initial printing"). Madison had the right to terminate the services agreements if Confucian and Hercules did not sell at least 20 percent of the guaranteed initial printing by December 31, 1981. Confucian and Hercules further agreed to print between three and four years after the initial printing, at least 75 percent of the number of copies each title had sold up to that time. However, Hercules could satisfy its obligation by printing 50 percent of the guaranteed initial printing. Confucian and Hercules also agreed to appoint Dell Distributing Corp. (hereinafter "Dell") and Kable News Co., Inc. (hereinafter "Kable"), respectively, as national distributors. [27] In essence, these national distributors were to provide all printing *156 and distributing services required under the services agreement. As consideration for their services, Confucian and Hercules were to receive a specified fee for copies sold on the first distribution (hereinafter "initial sales"), and a specified rate per copy on the next distribution (hereinafter "secondary sales") and a lesser rate on each copy sold thereafter (hereinafter "tertiary sales"). [28] Except for an initial cash payment of $2,000 per title which Madison made upon executing the services agreements, all payments were to be made from gross proceeds from sales of the books. [29]
*157 In return, Confucian and Hercules warranted that Madison would receive minimum specified amounts from sales (hereinafter "guaranteed gross receipts"). These guaranteed gross receipts under the services agreements equaled the amount of guaranteed proceeds under the acquisition agreements. Although these guaranteed gross receipts were payable to Madison, Confucian and Hercules were entitled to retain these receipts as payment of the balance of their agreed consideration on initial sales. [30] Further, the consideration due on secondary sales plus the payments on the notes under the acquisition agreements equaled approximately 100 percent of the gross proceeds from those sales. The net effect of these provisions allowed Gallen/Confucian and Kensington/Hercules (hereinafter collectively called "the publishers") to retain all of the gross proceeds on initial and secondary sales and required that sales reach the tertiary level before Madison would receive any cash. [31]
On July 26, 1979, Madison sold all of its interest in *158 the acquisition agreements to Arts. [32] As consideration, Arts agreed to pay Madison $824,000 in cash ($558,000 at the closing and $266,000 on March 1, 1980) and assumed Madison's obligations under the acquisition agreements. [33] Concurrently, Madison assigned to Arts its services agreements with Confucian and Hercules, [34] and in connection therewith, Arts agreed to reimburse Madison for its $2,000 per title expenditure. [35]
*159 It was the general practice of Gallen and Kensington to have their distributors solicit orders 3 to 4 months before a title was ready for sale. Based on the response to this solicitation, Gallen and Kensington determined the number of copies they would initially print. [36] Generally within one month after the titles appeared on retailers' racks, Gallen and Kensington would decide whether they would reprint a title. The 23 titles were first printed between March 1979 and June 1980; 14 of them were printed before August 1979. [37]
Prior to purchasing his limited partnership interest in Arts, petitioner received a copy of a "Confidential Descriptive Memorandum" (hereinafter "Offering Memorandum") dated April 17, 1979 and a "Summary of Offering" (hereinafter "Offering Summary"). The cover of the Offering Summary featured: 1. SOLID ECONOMICS 2. 4+TO1 LEVERAGE (aggregate of "at risk" deductions *160 and investment tax credits) [38]
3. NO RECAPTURE [39]
4. NO PERSONAL LIABILITY The Offering Summary contained a description of the proposed acquisition, a brief synopsis of eleven of the titles, a biography of their authors and a picture of eleven front covers. It explained that the first four titles were part of a "Making of America" series, similar in genre to three novels by John Jakes and James Michener which had sold millions of copies. It also stated that title 5 was a sequel to "Rose of Passion, Rose of Love," a B. Dalton bestseller. [40] The Offering Summary concluded that: [S]hould any one of our literary selections be received onlymoderately as well as the aforementioned *161 Jakes and Michener works, each of our partners will receive a substantial return on this investment; of course, if more than one does well, the results will literally be a financial"bonanza."
The Offering Memorandum contained a synopsis of each title and a biography of each author. In addition, it briefly reviewed the terms of the transaction, described the publishers, the seller, the general partner, and contained an extensive tax opinion, a form limited partnership agreement, a subscription agreement and an investor promissory note. It also contained a list of the purchase prices of each title and a tabulation of the number of copies of each title which had to be sold to retire its related note (ranging from 311,000 to 1,900,000), exclusive of interest. [41] To assist the reader in evaluating this information the Offering Memorandum explained that: [42]
Only a small percentage of books have such successful soft cover book sales and the number of *162 [copies] required to be sold to pay off the purchase money indebtedness in each case exceeds the industry average of sales of such books. No representation or assurance can be given as to the number of [copies], if any, embodying each work which may be sold. * * * The Offering Memorandum disclosed that Arts would pay Bromwell a $10,000 origination fee, organizational expenses of $37,500, and that Madison would realize a profit of between $335,000 and $470,000 on its sale to Arts. In addition, *163 as annual management compensation, Arts agreed to pay Bromwell three percent of cash flow until the limited partners were credited with revenues equaling their investment. Afterward, Bromwell was entitled to 20 percent of cash flow. Missing from both the Offering Memorandum and Offering Summary was any projection of income, expenses, net income or cash flow which might be realized from sales or on the limited partners' investment. On its Partnership Income Tax Return for 1979, Arts reported: Gross Receipts
$ 307,000 Printing Expense
(353,000)
Depreciation
(1,368,778)
Amortization
(7,250)
Other Deductions
(1,860)
Ordinary loss
[43] $ (1,423,888)
In 1980, 1981, 1982 and 1984, Arts reported the following gross receipts, deductions and losses: GROSS
TOTAL
YEAR
RECEIPTS
DEDUCTIONS
LOSS
1980
868,482
3,205,403
(2,336,921)
1981
352,175
2,237,475
(1,885,300)
1982
61,414
1,527,718
(1,466,304)
1984
384
900,881
[44] (900,497)
*164 Expert Opinions
Madison retained several literary appraisers prior to Arts' purchase of the 23 titles. They rendered opinion letters [45] which recited their experience in the field, described the subject of each title, listed the purchase price, stated the number of copies that title would have to sell to recoup its cost, [46] and opined that revenues from the exploitation of that title would "at least meet the purchase price" and "in fact, may well exceed it after deductions of all costs" under the services agreements. [47] Absent from these opinion letters was any representation of fair market value, or analysis of gross sales, publishing costs, cash flow or net income expected to be realized from the title. Further, the Offering Memorandum referring to (but not including) these opinions cautioned that they were "estimates only" and could not be "regarded as definitive with respect to the relationship between the fair market value of the [titles] and the purchase price thereof." *165 At trial, petitioner submitted an expert's report, prepared by DeWitt C. Baker (hereinafter "Baker"), evaluating the 23 titles, as of March 1979, as a package rather than individually. Baker computed what portion of the notes would have to be amortized before the limited partners received back their cash investment, as well as two to three times their cash investment. [48] In this regard, he prepared a table showing the sales level (in copies) required for each title to return its cash investment. [49] Baker concluded that "the purchase price paid in the aggregate by Literary Arts Associates for the physical properties * * * represents the fair market value of said properties at the time of their acquisition." Nevertheless, Baker testified that of the 2,000 to 3,000 mass market paperback books published in 1978, only 89 sold over 1 million copies. Respondent submitted the expert opinions of Robert Sachs (hereinafter "Sachs") and Stephen Conland (hereinafter Conland"). These appraisers valued the manuscripts individually by computing the net profit expected *166 from each of them. [50] This involved estimating revenues by projecting sales based on the performance of the publisher and distributor, [51] and discounting the resulting profit for the risk of investment. The value of the 23 manuscripts totaled $143,250 in Sach's report and $126,700 in Conland's report. [52] In their opinion, Arts' purchase price was between 80 to 100 times the manuscripts' fair market value, and the sales levels required to amortize the notes were 6 to 10 times higher than could reasonably be expected. OPINION Section 183
Section 183 provides that if an activity is not engaged in for profit, expenses [53] attributable to the activity are deductible only to the extent of gross income from the activity. [54] Activities engaged in for profit are limited to those activities for which deductions are allowable for the taxable year under *167 section 162 (for a trade or business), section 212(1) (for the production or collection of income), or section 212(2) (for the management, conservation, or maintenance of property held for the production of income). Sec. 183(c). In addition, section 167(a) allows a depreciation deduction only for property used in a trade or business or held for the production of income, and section 48(a)(1) limits the investment credit to certain tangible depreciable property. Therefore, no depreciation deduction or investment credit is allowable for property used in an activity not engaged in for profit. Accordingly, petitioner's claims for the expense deductions, depreciation, and investment credit are only allowable if we find that Arts was an activity engaged in for profit. Elliott v. Commissioner,84 T.C. 227, 235-236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986). *168 To fall outside section 183, a partnership must show that it engaged in the activity with an "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dean v. Commissioner,83 T.C. 56, 74 (1984). "Profit" means economic profit, independent of tax savings. Landry v. Commissioner,86 T.C. 1284, 1303 (1986); Beck v. Commissioner,85 T.C. 557, 570 (1985); Herrick v. Commissioner,85 T.C. 237, 254 (1985). The courts have used words such as "basic", "dominant", "primary", "predominant", and "substantial" to describe the requisite profit objective. Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981). While the expectation need not be reasonable, there must be a bona fide objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Fox v. Commissioner,80 T.C. 972, 1006 (1983), *169 affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner,Krasta v. Commissioner,Leffel v. Commissioner,Rosenblatt v. Commissioner,Zemel v Commissioner,734 F.2d 5-9 (3d Cir. 1984); Hager v. Commissioner,76 T.C. 759, 784 (1981). When a partnership is involved, the objective is determined at the partnership level. Finoli v. Commissioner,86 T.C. 697, 721 (1986); Fox v. Commissioner,supra.Partnerships, however, present a special problem in applying section 183 as they are mere formal entities, and obviously, do not have independent minds of their own. Fox v. Commissioner,80 T.C. at 1007. Therefore, our attention must focus upon the general partner's intent, knowledge, conduct, expertise and success in the particular field as well as all other factors which he relied upon in making partnership decisions. Finoli v. Commissioner,supra at 722; Brannen v. Commissioner,78 T.C. 471, 508 (1982), *170 affd. 722 F.2d 695 (11th Cir. 1984); Hager v. Commissioner,supra at 784-785. [55]
Whether the requisite profit objective exists is a factual issue to be resolved on the basis of all the evidence in the case. Sutton v. Commissioner,84 T.C. 210, 221 (1985), affd. per curiam 788 F.2d 695 (11th Cir. 1986); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). However, greater weight is given to objective facts than to after-the-fact statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Thomas v. Commissioner,84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); *171 Dean v. Commissioner,supra at 74; Engdahl v. Commissioner,72 T.C. 659 (1979). Section 1.183-2(b), Income Tax Regs., contains a nonexclusive list of relevant factors to be considered in determining whether an activity is engaged in for profit. They are: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether the elements of personal pleasure or recreation are involved. We have carefully reviewed all of the facts in this case and based on the record, we find that Arts did not have the requisite profit objective. Rather, we are convinced that Arts was conceived and operated primarily, if not exclusively, as a "generic tax shelter" to *172 obtain tax deductions and credits for its limited partners. See Rose v. Commissioner, 88 T.C.     (Feb. 5, 1987). [56]
To begin with, the offering materials certainly promised to fulfill that objective. A limited partner was promised a 4+ to 1 equivalent write-off in 1979 and a 1 to 1 equivalent write-off in 1980, with no personal liability and no recapture. This, in effect, assured a prospective high tax bracket partner that he would more than recoup his cash investment regardless of the enterprise's success or failure. These promised tax benefits are suspiciously excessive and, consequently, require close scrutiny. See Flowers v. Commissioner,80 T.C. 914, 941 (1983). As to the economics of investing in Arts, the Offering Summary and Offering Memorandum *173 were long on platitudes and short on substance. They spoke in terms of "solid economics," "financial'bonanzas'" and a "substantial return" on investment, if any title does "onlymoderately as well" as million or multi-million copy bestsellers. However, no representation or estimate was made as to when the partners would receive any cash return. No projection of either gross revenues or net income for either the initial year or any subsequent year appeared in the promotional materials. No estimate of cash receipts or disbursements for the initial year or any subsequent year was included to show when cash distributions could be expected. See West v. Commissioner, 88 T.C.     (Jan. 7, 1987). Moreover, there is no indication that Bromwell even attempted to make any of these projections. This was true even though the contracts were to last for a total of nine years. The only economic analysis the Offering Memorandum provided was the projection of sales volume required to amortize the notes. Yet, the Offering Memorandum warned that these sales were above the industry average and that few paperback books achieve the sales volume necessary to pay off the principal *174 of the notes. Moreover, these figures did not take into account interest on the notes and therefore substantially understated the number of copies Arts needed to sell to pay off the notes in their entirety. The high tax benefits promised in the offering materials were made possible by using nonrecourse notes, totaling $11,495,000, as part of the claimed basis for depreciation and investment credit. Although the use of large nonrecourse financing compared with a small cash investment is not necessarily fatal to establishing a profit objective, it is a strong factor working against Arts because, as a practical matter, there was virtually no possibility that the notes would ever be paid. See Barnard v. Commissioner,731 F.2d 230, 231-232 (4th Cir. 1984), affg. Fox v. Commissioner,80 T.C. 972 (1983); Elliott v. Commissioner,84 T.C. 227, 238 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Estate of Baron v. Commissioner,83 T.C. 542, 556 (1984), affd. 798 F.2d 65 (2d Cir. 1986). For Arts to pay off the 23 notes (not including interest) eachKensington *175 title would have to sell over 311,000 copies while eachGallen title would have to sell over 1,100,000 copies. Factoring interest into the equation would have substantially raised these amounts. [57] Realizing sales of this magnitude was not even remotely probable when one considers that of the 2 to 3 thousand paperbacks published the previous year only 89 sold over 1 million copies. Moreover, these statistics include reprints of known best sellers. Further, the publishers involved here handled few, if any, original paperbacks with sales close to that magnitude. Both of them admitted at trial that in 1979 their best titles sold no more than 400,000 copies. Also suspicious *176 were the markups, exceeding 12,000 percent, from the advances Gallen and Kensington paid the authors to the purchase price negotiated by Madison.[58] This huge purchase price was "created" by using large nonrecourse notes. Although the advances paid the authors is not necessarily determinative of the fair market value of the titles, the difference between these advances and the purchase price is so great that Madison was not even playing in the same ballpark. See Seaman v. Commissioner,84 T.C. 564, 593-594 (1985); Surloff v. Commissioner,81 T.C. 210, 235-236 (1983). Petitioner argues that these markups were attributable to the costs Gallen and Kensington incurred in developing the manuscripts into printable titles and their retained responsibility to pay royalties to the authors. Although admittedly these costs were involved, under any reasonable scenario, they would amount to but a very small fraction of the millions of dollars difference between Arts' purchase price and the advances Gallen *177 and Kensington paid the authors. Therefore, these costs cannot justify the huge markups involved herein. Further, Cohen did not rely upon the opinions referred to in the Offering Memorandum either when Madison purchased the titles from Gallen and Kensington in March 1979 or when Arts purchased the titles from Madison in July 1979. The opinions were prepared after Madison had signed its deals with Gallen and Kensington. Since the subsequent purchase by Arts from Madison did not involve arms-length negotiations (Cohen controlled both parties to the agreement), we are convinced that these opinions were mere "window dressing" obtained solely to give the appearance of credibility to Arts' enterprise. Moreover, the appraisers did not even attempt to determine the titles' fair market values, i.e., the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion and both having reasonable knowledge of relevant facts. United States v. Cartwright,411 U.S. 546, 551 (1973). Using language Cohen himself had written, they merely opined that revenues less costs under the services agreements would equal or exceed *178 the purchase price. See Beck v. Commissioner,85 T.C. 557, 578-579 (1985). Even if we assume these opinions to be correct, factoring in the interest on the notes alone precludes profits for Arts. Further, the bases for making the appraisers' opinions were vague. For instance, even though 20 mystery puzzlers had already been published before Arts got into the picture, the appraisers either did not know or did not consider the success (or failure) of previous titles in this series. Although one appraiser stated: "that the Mystery Puzzler series * * * is reportedly receiving highly enthusiastic wholesaler and retailer response," he did not quantify that response or evaluate it in terms of the magnitude of sales necessary for the series to produce a profit for Arts. We cannot believe that a serious appraisal of the titles would have omitted such an obvious consideration. Nor can we believe that any entity seriously interested in realizing a profit would agree to pay over twelve million dollars (including over $800,000 in cash) for 23 titles without requiring more adequate appraisals of fair market value. Finally, by July 1979, when Arts made its purchase from *179 Madison, sales for 14 of the titles already had been solicited and these books printed. Consideration of these results would have indicated that the titles were, in light of Arts' purchase price, fast becoming commercial failures. See Fox v. Commissioner,80 T.C. at 1009. Had Cohen considered the results of these solicitations (or obtained appraisers who did) he would have learned that Kensington did not have orders for or even prospects of selling the requisite number of copies for Arts to receive any gross proceeds. Notwithstanding that bleak prospect, in July 1979, Arts agreed to pay Madison $824,000 in cash. The valuation report petitioner's expert prepared for trial was similarly defective. [59] The conclusions were based on the total purchase price, not on the fair market values of the individual titles. Although the report considered the sales volume necessary for each title to return the cash Arts paid for it, the report failed to evaluate the likelihood of achieving such sales. Rose v. Commissioner,supra. Finally, the report spoke in generalities, such as "largest sales potential" and "strong category," without quantifying such terms. *180 We found Conland's and Sachs' reports to be far more credible. They quantified their methodology and determined the fair market value of each manuscript. Petitioner argues that we should not rely on Conland's and Sachs' reports because in determining their valuations they did not include the costs of preparing the manuscripts for printing or the payments under the services agreements. However, that argument must fail in light of the substantial price discrepancy. Petitioner has not shown that the cost to develop the manuscripts into the "properties" purchased exceeded $20,000 apiece, a pittance in relation to the $12,319,000 purchase price. Nor has he shown that the actual cost to print and distribute the titles differed dramatically from the actual payments made under the services agreements, at least at the initial and secondary sales levels. Therefore, even factoring these differences and the royalties Gallen and Kensington agreed to pay into the equation, petitioner does not even come close to explaining why Arts paid over 80 times more for the titles than the values Conland and Sachs ascribed to them. Respondent's experts opined that no Gallen title would sell more than *181 175,000 copies and no Kensington title would sell more than 80,000 copies. Although the sales volume was the most significant factor used in valuing the titles, petitioner's arguments do not even attempt to refute Conland's and Sachs' projections that the titles would sell less than one-sixth the number of copies required to amortize the notes. Consequently, although we view Conland and Sachs' projections as conservative, the sales volume needed to justify petitioner's position is so disproportionately huge that we have no difficulty in finding that there was no real probability that it could be realized. Having carefully weighed the evidence, we must conclude that the fair market value of these properties did not even approach their over $12,000,000 purchase price. We are convinced that in no event could these properties be worth any seven figure amount. Accordingly, we find that the properties purchased by Arts from Madison were worth less than $1 million dollars. This is not even a close case. We found Cohen to be an intelligent person with a great deal of business savvy. If Arts had a real profit objective he would have considered the factors discussed above and determined *182 that the purchase price for the 23 titles equaled many times their fair market value. Since Arts willingly paid this inflated price, we can only conclude that it purchased the titles without regard for their true profitability. See Brannen v. Commissioner,78 T.C. 471, 509 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Elliott v. Commissioner,84 T.C. at 239. Further, we are convinced that these purchase prices were arrived at to afford the limited partners sufficiently large tax benefits to make profit potential an incidental consideration. Petitioner argues that since Cohen's negotiations to purchase the titles from Gallen and Kensington were conducted at arm's length, the amounts Arts paid for the titles represent the best measure of their fair market value and it follows that Arts entered into the activity with an objective for profit. Generally, a current transaction resulting from bona fide negotiations between buyer and seller is the best measure of fair market value. Cf. Abramson v. Commissioner,86 T.C. 360, 372 (1986); *183 Lio v. Commissioner,85 T.C. 56, 71 (1985); Chiu v. Commissioner,84 T.C. 722 734-736 (1985). Nonetheless, even where the parties deal at arm's length, we need not give credence to the nonrecourse debt portion of the purchase price. Driggs v. Commissioner,87 T.C. 759 (1986). Under the circumstances in this case, the purchase price arrived at between Madison and Gallen and Kensington was not negotiated at arm's length, but, rather was maximized to provide the large basis needed to "create" huge tax deductions -- deductions large enough to return more than a high bracket taxpayers' cash outlay. See Fox v. Commissioner,80 T.C. at 1009. Moreover, when we focus on the cash portion of the transaction, we find that Cohen, as Madison's president, did indeed minimize the cash paid to Gallen and Kensington. Madison's initial cash outlay was only $6,500, with another $157,500 due by the end of 1979, after its sale to Arts. On the other hand, in the transaction between Madison and Arts, Cohen maximized the cash portion of the purchase price. Arts paid Madison $824,000 in cash, more than a 400 percent increase over the *184 cash Madison paid to Gallen and Kensington. Cf. Brannen v. Commissioner,78 T.C. at 508. Madison (an entity owned by Cohen and his family), not Arts, was the real profit maker here. [60]
Petitioner contends however, that we should focus our attention on the sales required to obtain a return on the cash invested. He maintains that because each title was financed by its own note and the notes were not cross-collateralized, one or two successes among the 23 titles could have generated an overall cash-on-cash profit to the partnership long before the notes were fully amortized. [61]
*185 Initially, we point out that in analyzing a transaction which includes large amounts of nonrecourse debt, the potential for a cash on cash profit does not, in itself, indicate a profit objective under section 183. Estate of Baron v. Commissioner,83 T.C. 542, 557-558 (1984), affd. 798 F.2d 65 (2d Cir. 1986). Otherwise, we would have the ridiculous situation of the taxpayer with the smallest cash investment and highest nonrecourse notes making the best argument for a profit objective. Therefore, in our evaluation of the economic profit potential, we must also look at all surrounding facts and circumstances. See Wildman v. Commissioner,78 T.C. 943, 954 (1982). Nevertheless, even if we assume petitioner's argument to be a valid one, we cannot find that Arts expected to "cash out" the project. That Arts might receive a percentage of the gross proceeds prior to the complete repayment of the notes does not show, in and of itself, that Arts in fact expected to receive enough cash to return its investment. Moreover, we can find no convincing *186 evidence that Cohen anticipated that Arts' expected cash receipts (after paying the publishers) would exceed the substantial amounts of cash paid in by the limited partners. Independent Electric Supply, Inc. v. Commissioner,781 F.2d 724, 728 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. In fact, we must characterize any such testimony as "wishful thinking" at best. Nor can we find any convincing evidence that, before Arts purchased the titles, Cohen even computed the sales volume that the one or two so-called "successes" would require to realize a "cash-on-cash profit." Nor were calculations even made in preparation for trial. [62]
Nowhere did Arts quantify what constituted a "success." For instance, the Offering Summary cited Rose of Passion, Rose of Love, to which title 5 is a sequel, as an indication of Arts' "solid economics." This predecessor, *187 which was on the B. Dalton Bestseller list for 4 weeks and considered to be reasonably successful by both Cohen and Gallen, sold approximately 150,000 copies. In comparison, many of Arts' titles had to sell three times as many copies merely to return the cash invested in that one title. For each of the 23 titles to return the cash portion of its purchase price, more than five and a half million copies would have to be sold and this quantity does not take into account interest payable on the notes! Petitioner argues, however, that a wildly successful title would sell sufficient copies to pay off its individual note (not all 23 notes) and interest and return the entire $824,000 cash investment. For any one title to do this would require sales far exceeding 1.3 million copies. [63] For all practical purposes, the probability of this occurring for any of these titles was virtually non-existent. In 1978, industry wide, less than 5 percent of mass market paperbacks reached this volume and some of these were reprints from hard cover titles whose popularity already had been established. For Arts, the likelihood was even more remote. Neither of Arts' publishers had a history of sales *188 of this magnitude. Indeed, respondent's experts projected that no title would sell sufficient copies to return the cash invested in that separate title, much less return sufficient cash to make Arts' activities profitable as a whole. Therefore, the book publishing venture that Arts entered into was not, as petitioner argues, a speculative one where most ventures fail but with a small chance of making a large profit. See sec. 1.182-2(a), Income Tax Regs. Rather, Arts had at best a minuscule chance of making any profit and no chance of making a large one. See Fox v. Commissioner,80 T.C. at 1017-1018. Nevertheless, petitioner argues that because its publishers and distributors entered into these activities with a profit *189 objective, Arts necessarily had a profit motive. [64] We do not doubt that Gallen and Kensington entered into their agreements with Arts intending to make reasonable sales efforts on behalf of the 23 titles resulting in a profit for them. In fact, the agreements were so structured. However, the publishers were adverse parties to Arts. To maximize their profit, Gallen and Kensington negotiated for as much of the proceeds as they could get, and to the extent they were successful, the proceeds to Arts were reduced accordingly. Therefore, there is no justifiable reason why we should attribute their motives to Arts. [65]
*190 We could go on to express additional reasons for our finding, but find it redundant. After considering the facts, the law, and petitioner's arguments, we are left with the inescapable conclusion that Arts' activity was launched knowing that it was destined only to have tax benefits and economic losses. See Rose v. Commissioner, 88 T.C.     (Feb. 5, 1987). The objectives here are all too evident. Large amounts of nonrecourse notes were used to create a high basis to support gigantic depreciation deductions and investment credits providing the limited partners with tax benefits exceeding their cash contributions. Substantially all of that cash was paid to Madison, an entity owned and controlled by the promoter, Cohen. Gallen and Kensington sold their titles for enough cash from the initial printing to at least cover their costs. In addition, they received what was, in effect, a percentage of the sales proceeds to assure them a profit. All the participants gained -- all at the expense of the United States. The excessive tax deductions and credits made the whole transaction feasible. No longer, for we have found that Arts was not formed and operated with the requisite *191 profit objective but rather with the primary purpose of providing tax benefits for the limited partners and, consequently, respondent properly disallowed pursuant to section 183 the deduction of petitioner's share of its reported losses. Petitioners also claimed an investment credit attributable to Arts' activities on their 1979 return. Having found that Arts was not engaged in an activity for profit, we also sustain respondent's disallowance of the claimed investment credit. Under section 48(a), only property which qualifies for depreciation under section 167(a) can qualify for an investment credit. Since, under section 167(a), a depreciation deduction is only allowable for property used in a trade or business or held for the production of income, it follows that no investment credit is allowable where the activity is not engaged in for profit. See Hagler v. Commissioner,86 T.C. 598, 621-622 (1986), on appeal (11th Cir., Sept. 15, 1986, and 2d Cir., Sept. 26, 1986). Section 6621(d)
By amendment to his answer, respondent has alleged that petitioners are liable *192 for an increased rate of interest under section 6621(d) on that portion of the deficiency attributable to the investment in Arts. In this, respondent has raised a "new matter", and consequently, bears the burden of proof. Rule 142(a); Parker v. Commissioner,86 T.C. 547, 566 (1986). Section 6621(d) provides for an increased interest rate where there is a substantial underpayment [66] of tax attributable to one or more tax motivated transactions. [67] A "tax motivated transaction" includes "any valuation overstatement (within the meaning of section 6659(c))." Sec. 6621(d)(3)(A)(i). Under section 6659(c) -- [T]here is a valuation overstatement if the value of any property or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). *193 On its 1979 partnership income tax return, [68] Arts claimed that the property it purchased from Madison had a cost basis of $12,319,000, including $11,495,000 of nonrecourse notes, and an adjusted basis [69] at the end of the year of $10,950,222.[70] Consequently, for the increased rate of interest to apply, we must find that, in fact, Arts' adjusted basis upon acquisition of the property was less than $8,212,667 [71] or at the end of 1979 was less than $7,300,148. [72] Since we have already found that the fair market value of the titles Arts purchased was less than $1,000,000, the correct adjusted basis of the titles did not include the nonrecourse indebtedness [73] and, therefore, was substantially less than these threshold amounts.[74]West v. Commissioner, 88 T.C.     (Jan. 7, 1987); see Beck v. Commissioner,supra, and cases cited therein. Therefore, there was a valuation overstatement and section 6621(d) applies. See Zirker v. Commissioner,87 T.C. 970 (1986). Further, the Regulations provide that any deduction disallowed under section *194 183 relating to an activity not engaged in for profit shall be considered to be attributable to a tax motivated transaction. Sec. 301.6621-2T, A-4(1), Proced. and Admin. Regs. (Temporary), T.D. 7998, 1985-1 C.B. 368, 369-370, 49 Fed. Reg. 50390, 50394 (Dec. 28, 1984). See Rose v. Commissioner,supra. Accordingly, we find that the deficiency arising from the disallowance of petitioner's claimed loss and investment credit attributable to Arts is a substantial underpayment of tax attributable to a tax motivated transaction, subject to the increased interest rate provided for in section 6621(d). *195 An appropriate order will be entered.
APPENDIX A Gallen's and
Madison's
Kensington's
Purchase Price
Art's Purchase Price
Respondent's Value
Title
Advance [1]
Cash
Notes
Cash
Notes
Sachs
Conland
1 $10,000
$10,500
$ 800,000
$ 75,000
$800,000
$15,400
$12,000
2 6,000
10,500
800,000
75,000
800,000
13,200
14,000
3 9,000
10,500
800,000
75,000
800,000
15,400
13,000
4 9,000
10,500
800,000
75,000
800,000
15,400
13,500
5 8,000
18,000
1,400,000
100,000
1,400,000
13,200
5,000
6 5,000
13,000
925,000
70,000
925,000
10,000
17,000
7 7,500
11,000
687,600
32,400
687,600
7,500
6,000
8 3,000
11,000
687,600
32,400
687,600
4,800
6,500
9 3,000
11,000
687,600
32,400
687,600
5,200
8,500
10
4,000
11,000
687,600
32,400
687,600
4,800
8,500
11
4,000
11,000
687,600
32,400
687,600
7,100
7,500
12
1,500
3,000
211,000
16,000
211,000
3,000
1,500
13
2,500
3,000
211,000
16,000
211,000
3,750
3,000
14
1,750
3,000
211,000
16,000
211,000
2,600
15
2,500
3,000
211,000
16,000
211,000
3,000
500
16
2,000
3,000
211,000
16,000
211,000
2,600
1,500
17
2,000
3,000
211,000
16,000
211,000
2,200
1,200
18
1,500
3,000
211,000
16,000
211,000
2,600
1,200
19
1,500
3,000
211,000
16,000
211,000
1,900
1,200
20
1,500
3,000
211,000
16,000
211,000
2,200
1,200
21
1,500
3,000
211,000
16,000
211,000
2,200
1,000
22
1,750
3,000
211,000
16,000
211,000
2,600
1,500
23
2,000
3,000
211,000
16,000
211,000
2,600
1,400
$90,500
$164,000
$11,495,000
$824,000
$11,495,000
$143,250
$126,700
*196 APPENDIX B Per Offering
Memorandum
Copies Each
Copies Required
Title Required
Copies
Respondent's Sales
To Pay Off Note
To Return Its
Date of
Printed
Projections
(Without
Cash Investment
First
and
(Number of Copies)
TITLE
Interest)
(Per Baker)
Printing
Distributed
Sachs
Conland
1 1,100,000
483,333
7/79
238,759
175,000
90,000
2 1,100,000
483,333
8/79
210,825
150,000
90,000
3 1,100,000
483,333
8/79
210,600
175,000
90,000
4 1,100,000
483,333
9/79
159,150
175,000
90,000
5 1,900,000
594,000
6/80
131,895
150,000
75,000
6 1,350,000
511,111
5/79
130,500
125,000
100,000
7 765,000
229,600
9/79
65,621
80,000
50,000
8 885,000
243,363
10/79
30,096
60,000
50,000
9 850,000
243,363
8/79
50,097
55,000
50,000
10
765,000
229,600
10/79
59,672
50,000
50,000
11
850,000
243,363
5/79
67,349
75,000
50,000
12
311,000
110,796
6/79
43,887
35,000
20,000
13
311,000
115,796
8/79
30,254
40,000
22,500
14
367,000
117,051
6/79
30,563
35,000
17,500
15
367,000
122,051
9/79
30,138
40,000
20,000
16
367,000
122,051
3/79
35,636
35,000
20,000
17
367,000
122,051
3/79
35,856
30,000
20,000
18
367,000
122,051
3/79
35,539
35,000
20,000
19
367,000
122,051
3/79
35,709
25,000
20,000
20
367,000
122,051
4/79
30,096
30,000
20,000
21
367,000
122,051
4/79
30,067
30,000
20,000
22
367,000
122,051
4/79
30,101
35,000
20,000
23
367,000
122,051
4/79
30,223
35,000
20,000
16,057,000
5,669,834
1,752,633
1,675,000
1,025,000
*197 Footnotes
1. This case was selected as representative of other cases filed by participants in this and similar partnerships organized by Jonathan T. Bromwell & Associates, Inc.↩
2. Unless otherwise specified, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Respondent originally determined a deficiency of $70,891.59 in petitioners' income tax for 1980 but changed this amount to $46,260.02 in an amended answer filed February 4, 1986. ↩
4. See amended answer filed February 4, 1986. ↩
5. This Court's Order dated December 3, 1985, severed the issues relating to petitioners' participation in Arts. The parties stipulated that only 1979 was being tried.↩
6. This determination affects Arts' trade or business deductions under section 162(a), depreciation deduction under section 167(a)↩, and investment credit under section 38 and related sections. 7. The parties have briefed other arguments, including: (1) whether Arts' acquisition of publishing rights and properties was a sham, serving no business purpose and lacking economic substance; (2) whether the nonrecourse notes given as part of the consideration for the property Arts acquired should be recognized for depreciation and investment credit purposes and qualify as genuine indebtedness for deducting interest; and (3) whether Arts' purchase price must be allocated between tangible and intangible rights to compute the allowable investment credit. We have omitted discussion of these other issues as we find the above two issues to be determinative.↩
8. Margaret H. Leger is a party to this proceeding solely because she filed a joint return with her husband.↩
9. Irving Cohen (hereinafter "Cohen") was president of Bromwell. He was awarded a Bachelors degree in English and a Masters degree in English literature in 1961 and 1962, respectively. In 1977, he began investigating the publishing industry. In 1978, he formed Bromwell and purchased between 200 and 300 literary properties. ↩
10. The term "mass market paperback" refers to rack sized paperbacks that usually are marketed through national magazine distributors and independent wholesalers to various retail entities. They are distinguishable from non-rack-sized or "trade" paperbacks generally marketed through bookstores.↩
11. All subsequent reference to these titles will be by number. ↩
12. Both Bromwell and Madison were owned beneficially by members of Cohen's family.↩
13. Hardcover publications subsequently distributed as paperbacks are known as "reprints".↩
14. A "manuscript" or "work" is the raw product submitted to a publisher by an author as distinguished from a "title" which is the finished product ready for printing. ↩
15. See Appendix A for the exact amount each author received.↩
16. The record does not reflect when this agreement was assigned to Gallen.↩
17. See Appendix A for the exact amount each author received. ↩
18. The works Gallen and Kensington purchased required development before they could be printed. The author's final manuscript was edited, typeset and then photographed onto lithographic films. Meanwhile, the editor developed a concept for the covers and spine of the book, an artist transformed that concept into a picture, and copy for the cover was written. Once approved, the cover was made into color separations. Finally, a print shop transferred the films and color separations onto metal plates and the titles were printed.↩
19. The agreements described the physical properties as consisting of: a number of engraved lithographic films each embodying forms of either 32 or 16 pages of the text of the Work and other pages to be included in the printed book; four color processed engraved lithographic films embodying the front cover art work for the printed book; and four color processed engraved lithographic films embodying the spine and back cover art work for the printed book, it being understood and agreed that no original artist's rendition is included in the above. ↩
20. The agreement with Kensington specifically excluded radio, television and film rights.↩
21. The amounts of the notes were $800,000 for each of title 1-4; $1,400,000 for title 5; and $925,000 for title 6. See Appendix A. ↩
22. The amounts of the notes were $687,600 for each of titles 7-11; and $211,000 for each of titles 12-23. See Appendix A.↩
23. Gross proceeds equaled approximately 40 percent of each title's cover price. See n. 29, infra.↩
24. Payments on the notes were to be applied first to accrued interest and then to principal.↩
25. The average life of a mass market paperback is less than one year. ↩
26. Confucian guaranteed an initial printing of 150,000 for titles 1-5 and 200,000 for book 6. Kensington guaranteed an initial printing of: 100,000 copies for titles 7-11; 40,000 copies for titles 12 and 15-23; 45,000 copies for title 13; and 35,000 copies for title 14.↩
27. Contracts between Dell and Kable as distributors and Gallen and Kensington as publishers actually date back to 1978 and 1974, respectively. No evidence was produced to show any written contractual obligations between Confucian and Dell or Hercules and Kable.↩
28. The fee varied between $8,000 and $42,000 on initial sales. The rate then varied between $ .32 and $ .42 per copy on secondary sales, and varied between $ .133 and $ .175 for all copies sold thereafter. For example, for title 9, Madison agreed to pay $19,000 for the first 22,100 copies sold, $ .377 for each of the next 87,900 copies sold, and $ .152 for each copy sold thereafter. ↩
29. The services agreements indicated that the 23 titles would be issued with retail cover prices ranging between $1.95 and $2.50. Gross proceeds equaled approximately 40 percent of the cover price.↩
30. The payment of $2,000 per title was part of the consideration. ↩
31. Indeed, Gallen viewed the agreements "in tandem" in evaluating its profit potential.↩
32. As noted earlier, Madison and Arts were controlled by Cohen. See notes 9 and 12, supra.↩
33. This included the interest which had accrued on the notes, but, did not include the $66,500 and $91,000 in cash due to Gallen and Kensington on December 31, 1979. Interest had been accruing on the non-recourse notes at the rate of $57,475 per month (($11,495,000 X 6%) / 12 mo.). ↩
34. Arts informed Gallen, Kensington, Confucian and Hercules that it had acquired from Madison the 23 titles as well as all related covenants and agreements under the acquisition and services agreements and had assumed all of Madison's obligations under these agreements. However, the notices to Gallen and Kensington were dated June 12, 1979, over a full month before the sale by Madison to Arts on July 26, 1979 as well as over a full month before the organization of Arts on July 23, 1979. ↩
35. Madison instructed (in letters dated June 12, 1979) Confucian and Hercules to pay directly to Gallen and Kensington, respectively, 60 percent of the gross proceeds from sales, in excess of guaranteed gross proceeds, until the notes (aggregating $5,525,000 in the case of Gallen and $5,970,000 in the case of Kensington), plus interest, had been paid.↩
36. In 1979, Gallen/Confucian's bestselling title sold approximately 250,000 copies while Kensington/Hercules had no title selling more than 400,000 copies. ↩
37. See Appendix B for the date each title was first printed and the number of copies printed and distributed.↩
38. The Offering Summary explained: "4+TO1 EQUIVALENT WRITE-OFFS IN 1979, AND 1 TO 1↩ IN 1980." 39. The Offering Summary explained that: While recapture exists in a technical sense due to the possibility of "forgiven debt", there are corresponding offsets predicated on accrued unused depreciation, thereby avoiding any future tax liabilities. Tax credits on the other hand are not subject to recapture -- see Tax Opinion in memorandum * * *.↩
40. "Rose of Passion, Rose of Love" had been on the B. Dalton bestseller list for four weeks, sold between 125,000 and 150,000 copies, and was considered by both Gallen's President and Cohen to be a successful title.↩
41. See Appendix B. ↩
42. The Offering Memorandum warned investors of the competitive nature of the book publishing business by stating: In excess of 43,000 books were published in the United States in 1977. Approximately 13,000 of these books were paperbacks of which in excess of 1,800 books were mass market paperbacks. Many of these books received little, if any, promotion or reviews by literary critics, thereby reducing the possibility of financial success for such books. There are many book publishers and distributors which possess substantial financial resources, large and experienced staffs and, doubtless, ownership of substantially more literary properties than [Arts].↩
43. Arts claimed no interest expense deduction on its 1979 return.↩
44. The amount of gross receipts, total deductions and income or loss Arts reported for 1983 is not contained in the record.↩
45. These opinions, dated April 12, 1979, and April 17, 1979, were rendered after Madison's purchase from Gallen and Kensington. ↩
46. The appraisers received these amounts, which are the same as those in the Offering Memorandum, from Madison. ↩
47. This language had been written by Cohen and adopted virtually verbatim by the appraisers.↩
48. Baker also did not include interest payments required on the notes when making his computations. ↩
49. See Appendix B.↩
50. Sachs valued the titles as of March 1979, while Conland valued them as of the month they were printed. ↩
51. See Appendix B for projected sales in copies. ↩
52. See Appendix A for Sach's and Conland's valuations of the 23 titles.↩
53. Deductions which are allowable without reference to gross income from the activity (e.g., interest and taxes) are not in issue. See Fuchs v. Commissioner,83 T.C. 79, 97↩ (1984). 54. Since Arts' cost of goods sold exceeded its gross receipts, it had no gross income. See sec. 1.61-3(a), Income Tax Regs.↩
55. Little significance is given to the limited partners' intent since they have no control over the partnership activities or business deductions. Landry v. Commissioner,86 T.C. 1284, 1303 (1986); Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695↩ (11th Cir. 1984).
56. This case was tried and briefed by the parties in terms of a profit objective under sec. 183, prior to our recent opinion in Rose v. Commissioner, 88 T.C.     (Feb. 5, 1987). (Cf. footnote 7, supra.) Accordingly, our analysis is based upon that approach. However, Rose↩ adopts a test of economic substance as to "generic" tax shelters. Our conclusion is the same under either test.
57. Because the amount of interest depended on how fast the notes were paid off, which in turn depended upon how rapidly the titles would sell, a prospective investor would have to make assumptions as to how rapidly sales would be realized to compute the number of copies necessary to pay off the notes. No such assumptions were presented in the offering materials nor do we have any evidence that such computations were made by Bromwell either prior to or after its decision that Arts purchase these titles.↩
58. Advances to authors totaled $90,500. Madison's purchase price totaled $11,659,000. Arts' purchase price totaled $12,319,000. See Appendix A.↩
59. Experts' opinions are admissible and relevant to the issue of value, but we must weigh those opinions in light of each expert's qualifications and all other relevant evidence of value. Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court; Johnson v. Commissioner,85 T.C. 469, 477 (1985). We may reject expert testimony when in our best judgment it is appropriate to do so. Helvering v. National Grocery Co.,304 U.S. 282, 295 (1938); Chiu v. Commissioner,84 T.C. 722, 734 (1985). See also Waddell v. Commissioner,86 T.C. 848, 878↩ n. 16 (1986).
60. Arts' Offering Memorandum not only warned prospective investors of conflict of interest among the related parties, but specifically stated that "The seller * * * will receive substantial profits from the sale of the book properties * * * whether or not distribution * * * is commercially successful."↩
61. Essentially, petitioner is maintaining that Arts did not expect to pay off the notes when it entered into the acquisition agreements. This argument is inconsistent with his earlier argument that the purchase price, which included the face amount of the notes, represented the fair market of the titles.↩
62. Although petitioner contends in his brief that Baker made these calculations, Baker's calculations were made to evaluate the cash returns on individual titles. No calculations of the volume necessary for one or two successes to result in overall profitability or cash returns were submitted.↩
63. The gross proceeds Arts received on the sale of any copy was generally less than $1. The smallest note was $211,000 and the cash invested in Arts totaled $1,125,000. Therefore, over 1.3 million copies would have to be sold to pay off the note on the least costly book plus return the cash investment. Again, we must add to these figures sales of sufficient copies to pay interest and services agreement charges.↩
64. As petitioner implies, our inquiry is not confined solely to the activities of the partnership. Instead, where a partnership has contractually assigned most of the normal duties and responsibilities associated with the income generating operations to third parties, "the scope of the relevant inquiry therefore expands to encompass the entirety of such multi-layered transactions." Flowers v. Commissioner,80 T.C. 914, 932↩ (1983). 65. Our finding that publishers planned to make a profit is not inconsistent with our finding that Arts did not have such an objective. As explained in an analogous situation in Estate of Baron v. Commissioner;798 F.2d 65, 74 (2d Cir. 1986), affg. 83 T.C. 542 (1984): There would be no inconsistency, for example, in Casablanca's viewing as favorable consideration for the sale the $90,000 cash plus whatever payments might be made on the note, while for Baron the real purpose of the investment lay in the tax benefits that he hoped to derive. [Fn. ref. omitted.] See also Beck v. Commissioner,85 T.C. 557, 579-580 (1985); Dean v. Commissioner,83 T.C. 56, 72-73↩ (1984).
66. The underpayment in this case exceeds the $1,000 floor required under sec. 6621(d)(2)↩. 67. The additional interest accrues after December 31, 1984, regardless of the date the return is filed. Stanley Works and Subsidiaries v. Commissioner,87 T.C. 389, 414 (1986); Snyder v. Commissioner,86 T.C. 567, 588 (1986); Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005↩ (2d Cir. 1986).
68. Items on a partnership income tax return are imputed to a partner's personal income tax return. See Estate of Klein v. Commissioner,537 F.2d 701, 704 (2d Cir. 1976), affg. 63 T.C. 585 (1975); Helba v. Commissioner,87 T.C. 983↩ (1986). 69. Under these circumstances, the term "adjusted basis" means "basis" (as determined under section 1012), adjusted as provided for in sec. 1016. Sec. 1011(a); see sec. 1.1011-1, Income Tax Regs.↩ Sec. 1016 requires that basis be adjusted downward for depreciation. Sec. 1016(a)(2). 70. Arts' purchase price of $12,319,000 less depreciation of $1,368,778. ↩
71. $12,319,000 divided by 150 percent. ↩
72. $10,950,222 divided by 150 percent. ↩
73. It is generally accepted that where property is acquired by purchase, its cost includes the amount of liabilities assumed, or taken subject to, by the purchaser. Crane v. Commissioner,331 U.S. 1 (1947); Parker v. Delaney,186 F.2d 455 (1st Cir. 1950); Blackstone Theater Co. v. Commissioner,12 T.C. 801, 804 (1949). The mere fact that the liability is secured only by the asset transferred and the purchaser otherwise has no personal liability will not, in and of itself, prevent such liability from being included in the basis of the property. Mayerson v. Commissioner,47 T.C. 340 (1966). However, it is well settled that basis is determined by the actual investment in the property. Siegel v. Commissioner,78 T.C. 659, 684 (1982); Narver v. Commissioner,75 T.C. 53, 98 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); Mayerson v. Commissioner,supra at 350. Therefore, where, as in this case, nonrecourse indebtedness exceeds the fair market value of the acquired property, there is no "investment in the property" attributable to such indebtedness and the indebtedness is not added to basis. Fuchs v. Commissioner,83 T.C. 79, 101-102 (1984); Dean v. Commisioner,supra↩ at 77-78 (1984).
74. We need not decide which of these two dates is the proper measure under section 6621(d)↩ for both tests are easily met in this case.
1. In addition, for every title except number 11, Gallen and Kensington agreed to pay royalties of 6 percent on the net retail sales of the first 150,000 copies and 8 percent on the net retail sales of all additional copies. For title 11, the royalty percentages at these levels were 8 and 10 percent.↩