JONATHAN T. BROMWELL AND ASSOCIATES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jonathan T. Bromwell & Assocs. v. Commissioner
Docket No. 23170-88
United States Tax Court
T.C. Memo 1993-438; 1993 Tax Ct. Memo LEXIS 445; 66 T.C.M. (CCH) 799; September 20, 1993, Filed *445 Decision will be entered under Rule 155. For petitioner: Jules Ritholz and David M. Kohane. For respondent: Andrew M. Winkler and D. Lyndell Pickett. FAY
FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: This case was assigned to and heard by Special Trial Judge Joan Seitz Pate pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the Special Trial Judge's opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PATE, Special Trial Judge: Respondent determined the following deficiencies in and additions to the Federal income tax of Jonathan T. Bromwell & Associates, Inc. (hereinafter Bromwell or petitioner): (1) For the taxable year ended October 31, 1978, a deficiency of $ 501,003 and an addition to tax under section 6653(a) of $ 25,050; (2) for the taxable year ended October *446 31, 1979, a deficiency of $ 618,915 and an addition to tax under section 6653(a) of $ 30,946; and (3) for the taxable year ended October 31, 1980, a deficiency of $ 1,128,376 and an addition to tax under section 6653(a) of $ 56,419. [2] For each of the years at issue, respondent has also determined that petitioner is liable for an enhanced rate of interest under section 6621(c). When it filed its petition in this case, petitioner's principal place of business was in New York, New York. Some of the issues giving rise to the proposed deficiencies have been settled by the parties. [3]
*447 Petitioner's president was an individual named Irving Cohen (hereinafter Cohen). In 1961, Cohen was awarded a bachelor's degree in English and, in 1962, he received a master's degree in English Literature. In 1977, he began investigating the publishing industry and, in 1978, he formed petitioner. Within the next 4 years, petitioner purchased between 200 and 300 books (hereinafter titles). During its taxable years 1978 and 1980, petitioner acquired certain rights and properties associated with some 47 titles. In the notice of deficiency, respondent disallowed depreciation deductions and investment tax credits relating to these 47 titles, which petitioner claimed on its income tax returns for its taxable years 1978, 1979, and 1980. Respondent also disallowed an interest expense deduction of $ 310,650 claimed for its taxable year 1979, which deduction arose in connection with promissory notes associated with petitioner's purchase of the titles. In addition, during 1979 and 1980, petitioner organized and promoted 51 limited partnerships (hereinafter the Partnerships). On its Federal income tax return for its taxable year 1980, petitioner deducted losses from nine of the partnerships *448 for which it was the general partner. Respondent also disallowed these losses. One of the partnerships for which petitioner deducted losses was named Literary Arts Associates (hereinafter Arts). The parties have stipulated that, for purposes of this case only, our determination as to the allowability of the claimed partnership losses and investment credits relating to Arts shall control the allowability of the losses (attributable to the depreciation deductions, interest expense, and remaining unagreed printing expenses) and credits claimed by petitioner with respect to the 47 titles and with respect to its share of partnership losses and credits from the eight partnerships other than Arts. The parties have also agreed that the interest petitioner deducted for 1979 will not be allowable if Arts' nonrecourse notes are not includable in the tax basis of the titles it purchased. We have already considered and decided the allowability of losses and credits arising from the participation in Arts by one of its limited partners, Thomas J. Leger, in Leger v. Commissioner, T.C. Memo. 1987-146, affd. without published opinion 860 F.2d 435 (5th Cir. 1988) *449 (hereinafter Leger). In fact, this case marks the fifth time that we have had before us claimed deductions and credits arising from Bromwell programs. (In addition to Leger, see Elliott v. Commissioner, 84 T.C. 227 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Cashman v. Commissioner, T.C. Memo. 1989-533, affd. without published opinion 930 F.2d 26 (9th Cir. 1991); and Ziegler v. Commissioner, T.C. Memo. 1984-620.) In all of these cases, we have upheld respondent's determinations and our decisions have been affirmed by the Third, Fifth, and Ninth Circuits. Despite all of this prior litigation, petitioner contends that opinions of the Court of Appeals for the Second Circuit, which were issued after our opinion in Leger, will change the result in this case. Consequently, the issues for our decision are: (1) Whether petitioner is entitled to deduct its share of losses and investment credits from Arts' publishing activities because they lacked economic substance; (2) whether petitioner may deduct its *450 share of interest on promissory notes that comprised part of the purchase price of the titles because the notes were properly includable in tax basis; (3) whether petitioner is liable for additions to tax under section 6653(a) for negligence or intentional disregard of the rules and regulations, and (4) whether petitioner is liable for an enhanced rate of interest under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and they are so found. Additionally, the parties have stipulated that the Court may incorporate the facts found in Leger into evidence in this case. During the years in issue, petitioner participated in the book publishing industry by purchasing titles and: (a) retaining ownership of some of the titles and arranging for the marketing of books produced therefrom, including the 47 titles referred to above, (b) reselling titles for a profit to unrelated individuals and entities, and (c) selling titles in groups to limited partnerships. Petitioner organized Arts, the limited partnership at issue in this case, on July 23, 1979, to acquire and exploit mass market [4] paperback books. It served as Arts' general partner. It sold 25 limited partnership *451 units in Arts at $ 45,000 cash per unit, for a total of $ 1,125,000. Petitioner also acquired one of these limited partnership units for $ 45,000. Arts then acquired, for a total purchase price of $ 12,319,000 ($ 824,000 in cash and $ 11,495,000 in nonrecourse notes), the following 23 titles [5] from Madison Library, Inc. (hereinafter Madison). TITLE 1. The Wilderness Seekers 2. The Mountain breed 3. The Conestoga People 4. Hearts Divided 5. Rose of Fury, Rose of *452 Flame 6. Meteorite Track 291 7. The Tapestry 8. Tara of the Twilight 9. Benediction 10. Another Love, Another Time 11. The Sin 12. What Price Love 13. Without Sin Among You 14. Shadow Game 15. Chrysalis 5 16. You'll Die Today 17. The Final Fair 18. Death in a Small World 19. The Sandcastle Murder 20. Murder by the Book 21. You'll Be the Death of Me 22. The Whispering Cat Mystery 23. Who Killed Me? Both petitioner and Madison were owned beneficially by members of Cohen's family and were controlled by Cohen during the years in issue. All 23 titles were produced from original manuscripts; none were reprints. [6] They included four historical fiction, two historical romance, three contemporary romance, two science fiction, one fantasy, two thrillers, one romantic mystery, and eight mystery puzzlers. All were written by professional authors. The four historical fiction titles (titles 1-4) were the first titles in the "Making of America" series. This series attempted to capitalize on the popularity of three novels, written by John Jakes and James Michener, which had sold millions of copies. However, neither John Jakes nor James Michener wrote any *453 of the novels in the "Making of America" series. The eight mystery puzzlers (titles 16-23) were numbers 21 through 28 of a series. As an innovative feature, each mystery puzzler contained a sealed final chapter giving the solution to the mystery. This provided the reader with an opportunity to solve the mystery before finding out "who done it". The Transactions Involved
Between November 1978 and January 1979, the authors of titles 1-5 sold exclusive rights to print, publish, license, and sell their works [7] to James A. Bryans Books (hereinafter Bryans Books). The latest delivery dates for these works ranged between December 31, 1978 and April 1, 1979. As consideration, the authors received advances against royalties totaling $ 42,000; no single advance exceeded $ 10,000. [8] In addition, each author was entitled to royalties at the rate of 6 percent of net retail sales on the first 150,000 copies sold and 8 percent *454 on all additional copies sold thereafter. On March 29, 1979, Bryans Books assigned all of its rights in titles 1-5 to Richard Gallen & Co., Inc. (hereinafter Gallen), for an interest in profits. On November 17, 1977, the author of title 6 sold his rights to GM Publishing, Inc. This work was deliverable by March 31, 1978. The author received a $ 5,000 advance plus the right to royalties of 6 percent of net retail sales on the first 150,000 copies and 8 percent thereafter. This agreement was also subsequently assigned to Gallen. [9] Hereinafter titles 1-6 will be referred to collectively as the "Gallen titles". *455 By agreements, dated between July 26, 1978, and April 2, 1979, the authors of titles 7-23 sold exclusive rights to license, manufacture, print, publish, and distribute their works to Kensington Publishing Corp. (hereinafter Kensington), with deadlines ranging between January 1, 1979, and April 15, 1979. The authors received advances against royalties ranging between $ 1,500 and $ 7,500 [10] and totaling $ 43,500. The agreement for title 11 provided for the payment of a royalty at the rate of 8 percent on the net retail sales on the first 150,000 copies sold and 10 percent on all additional copies sold thereafter. Each of the other authors were entitled to royalties based on the net retail sales of his or her work, at the rate of 6 percent on the first 150,000 copies sold and 8 percent on all additional copies sold thereafter. The agreements also obligated Kensington to publish 10,000 copies of each title on or before dates ranging between March 31, 1980, and December 31, 1981. Hereinafter titles 7-23 will be referred to collectively as the "Kensington titles". *456 The works Gallen and Kensington purchased required development before they could be printed. The author's final manuscript was edited, typeset, and then photographed onto lithographic films. Meanwhile, the editor developed a concept for the covers and spine of the book, an artist transformed that concept into a picture, and copy for the cover was written. Once approved, the cover was made into color separations. Finally, a print shop transferred the films and color separations onto metal plates from which the titles were printed. Early in 1979, Cohen, as president of Madison, negotiated with Gallen and Kensington to purchase the 23 titles subsequently acquired by Arts. Gallen and Kensington had previously decided to publish these 23 titles. From the numerous titles Gallen and Kensington intended to publish, Cohen "cherry-picked" the ones he wanted based on the expected initial printing, a synopsis of the story, a biography of the author, and consultations with people familiar with the industry. He read only one of the titles. By agreement dated March 28, 1979, Madison purchased from Gallen and Kensington the "physical properties" for each title together with the right to *457 print, publish, distribute, and sell each title in paperback form. The agreements with Kensington specifically excluded radio, television, and film rights. Gallen and Kensington retained their obligations to the authors under their respective contracts. The agreements described the physical properties as consisting of: a number of engraved lithographic films each embodying forms of either 32 or 16 pages of the text of the Work and other pages to be included in the printed book; four color processed engraved lithographic films embodying the front cover art work for the printed book; and four color processed engraved lithographic films embodying the spine and back cover art work for the printed book, it being understood and agreed that no original artist's rendition is included in the above.
As consideration for the transfer of the Gallen titles, Madison agreed to pay Gallen $ 73,000 in cash (a downpayment of $ 6,500 plus $ 66,500 by December 31, 1979) and to execute a separate nonnegotiable, nonrecourse promissory note for each title, all due by October 1, 1988, and totaling $ 5,525,000. [11] As consideration for the transfer of the Kensington titles, Madison made no cash *458 downpayment, agreed to pay Kensington $ 91,000 in cash by December 31, 1979, and executed and delivered a separate nonnegotiable, nonrecourse promissory note for each title, all due on October 1, 1988, and totaling $ 5,970,000. [12] If Madison failed to make the cash payments required under the agreements by December 31, 1979, all the transferred properties and rights would revert to Gallen and Kensington without further liability on Madison's part. The notes, dated March 28, 1979, and carrying 6 percent interest, were payable semi-annually from 60 percent of the gross proceeds derived from sales. Payments on the notes were to be applied first to accrued interest and then to principal. However, no interest or principal payments were required from an *459 initial amount of proceeds (hereinafter guaranteed proceeds), which ranged from $ 20,000 to $ 40,000 for the Gallen titles and from $ 6,000 to $ 17,000 for the Kensington titles. In a separate security agreement for each note, Madison conveyed to Gallen or Kensington, as appropriate, its rights in the related title. In the event of default, forfeiture of the right to the transferred properties was the sole remedy available to the sellers. These notes were not cross-collateralized; that is, the proceeds Madison received from one title would not be used to pre-pay the notes on the other titles. Gallen and Kensington required at least part of the notes as additional compensation for the sales of the titles. However, they did not require notes in face amounts as high as ultimately resulted. On March 28, 1979, Madison also entered into services agreements with Confucian Press, Inc., a subsidiary of Gallen (hereinafter Confucian), and Hercules Service Corp., an affiliate of Kensington (hereinafter Hercules), in which Confucian and Hercules agreed to produce, print, bind, distribute, sell, and promote paperback editions of the 23 titles for 9 years. [13] The contracts guaranteed that *460 a specified minimum number of copies (between 35,000 and 200,000) [14] of each title would be printed before the end of 1979 (hereinafter the guaranteed initial printing). Madison had the right to terminate the services agreements if Confucian and Hercules did not sell at least 20 percent of the guaranteed initial printing by December 31, 1981. Confucian and Hercules further agreed that, between 3 and 4 years after the initial printing, they would print at least 75 percent of the number of copies each title had sold up to that time. However, Hercules could satisfy its obligation by printing 50 percent of the guaranteed initial printing. Confucian and Hercules also agreed to *461 appoint Dell Distributing Corp. (hereinafter Dell) and Kable News Co., Inc. (hereinafter Kable), respectively, as national distributors. [15] In essence, these national distributors were to provide all printing and distributing services required under the services agreements. As consideration for their services, Confucian and Hercules were to receive a specified fee for copies sold on the first distribution (hereinafter initial sales), and a specified rate per copy on the next distribution (hereinafter secondary sales) and a lesser rate on each copy sold thereafter (hereinafter tertiary sales). [16] Except for an initial cash payment of $ 2,000 per title, which Madison made upon executing the services agreements, all payments were to be made from gross proceeds *462 from sales of the books. The services agreements indicated that the 23 titles would be issued with retail cover prices ranging between $ 1.95 and $ 2.50, and the term "gross proceeds" equaled approximately 40 percent of the cover price. The services agreements required both Confucian and Hercules to use their best efforts to maximize sales and to create as much favorable publicity as reasonably possible. In return, Confucian and Hercules warranted that Madison would receive minimum specified amounts from sales (hereinafter guaranteed gross receipts). These guaranteed gross receipts under the services agreements equaled the amount *463 of guaranteed proceeds under the acquisition agreements. Although these guaranteed gross receipts were payable to Madison, Confucian and Hercules were entitled to retain these receipts as payment of the balance of their agreed consideration on initial sales. [17] Further, the consideration due on secondary sales plus the payments on the notes under the acquisition agreements equaled approximately 100 percent of the gross proceeds from the sales. The net effect of these provisions allowed Gallen/Confucian and Kensington/Hercules (hereinafter collectively called the publishers) to retain all of the gross proceeds on initial and secondary sales and required that sales reach the tertiary level before Madison would receive any cash. On July 26, 1979, Madison sold all of its interest in the acquisition agreements to Arts. As consideration, Arts agreed to pay Madison $ 824,000 in cash ($ 558,000 at the closing and $ 266,000 on March 1, 1980) and assume *464 Madison's obligations under the acquisition agreements. This included interest which had accrued on the notes, but did not include the $ 66,500 and $ 91,000 in cash due to Gallen and Kensington on December 31, 1979. Interest had been accruing on the nonrecourse notes at the rate of $ 57,475 per month ($ 11,495,000 X 6% / 12 mo.). Concurrently, Madison assigned to Arts its services agreements with Confucian and Hercules. Arts informed Gallen, Kensington, Confucian, and Hercules that it had acquired from Madison the 23 titles, as well as all related covenants and agreements under the acquisition and services agreements, and had assumed all of Madison's obligations under these agreements. However, the notices to Gallen and Kensington were dated June 12, 1979, over a full month before the sale by Madison to Arts on July 26, 1979, as well as over a full month before the organization of Arts on July 23, 1979. In connection with each assignment, Arts agreed to reimburse Madison for its $ 2,000 per title expenditure. In addition, Madison instructed (in letters dated June 12, 1979) Confucian and Hercules to pay directly to Gallen and Kensington, respectively, 60 percent of the gross *465 proceeds from sales, in excess of guaranteed gross proceeds, until the notes (aggregating $ 5,525,000 in the case of Gallen and $ 5,970,000 in the case of Kensington) plus interest, had been paid. Confucian and Hercules and their distributors promoted the titles. Their promotional activities included distributing promotional fliers and catalogues, advertising on radio and in trade publications like Publisher's Weekly, and making direct sales to book stores. Generally, the distributors solicited orders from their retailers 3 to 4 months before a title was ready for sale. Based upon the response to this solicitation, Gallen and Kensington determined the number of copies they would initially print. Generally, within 1 month after the titles appeared on retailers' racks, Gallen and Kensington would decide whether they would reprint a title. The 23 titles Arts purchased were first printed between March 1979 and June 1980; 14 of them were printed before August 1979. [18]
*466 In 1979, Gallen's bestselling title sold approximately 250,000 copies, while Kensington had no title selling more than 400,000 copies. Prior to purchasing a limited partnership interest in Arts, potential limited partners received a copy of a "Confidential Descriptive Memorandum" (hereinafter Offering Memorandum) dated April 17, 1979, and a "Summary of Offering" (hereinafter Offering Summary). The cover of the Offering Summary featured: 1. SOLID ECONOMICS 2. 4+ TO 1 LEVERAGE (aggregate of "at risk" deductions and investment tax credits) [19]
3. NO RECAPTURE [20]
4. NO PERSONAL LIABILITY *467 The Offering Summary contained a description of the proposed acquisition, a brief synopsis of 11 of the titles, a biography of their authors, and a picture of 11 front covers. It explained that the first four titles were part of a "Making of America" series, similar in genre to three novels by John Jakes and James Michener which had sold millions of copies. It also stated that title 5 was a sequel to "Rose of Passion, Rose of Love", a B. Dalton bestseller. "Rose of Passion, Rose of Love" had been on the B. Dalton bestseller list for four weeks, sold between 125,000 and 150,000 copies, and was considered by both Gallen's president and Cohen to be a successful title. The Offering Summary concluded that: Should any one of our literary selections be received only moderately as well as the aforementioned Jakes and Michener works, each of our partners will receive a substantial return on this investment; of course, if more than one does well, the results will literally be a financial "bonanza."
The Offering Memorandum contained a synopsis of each title and a biography of each author. In addition, it briefly reviewed the terms of the transaction, described the publishers, *468 the seller, the general partner, and contained an extensive tax opinion, a form limited partnership agreement, a subscription agreement, and an investor promissory note. The tax opinion contained carefully circumscribed recommendations about the program, such as the following: While it is our view, as discussed below, that the facts herein presented appear to support the conclusion that the fair market value of the Properties at the time of their purchase will be commensurate with the purchase price, Limited Partners should be aware that the Service has indicated that such transactions will be subject to particular scrutiny, and that no assurance can be given that a challenge by the Service will not be successful in any given case. Under the circumstances, we believe it to be the better view that the face amount of the Notes should be includible in the Partnership's basis in the Properties for computing depreciation and gain and loss, to the extent of their fair market value. However, there can be no assurance that the Service will not attack such a determination, based upon any of the contingencies discussed above.
The Offering Memorandum also contained a list of the *469 purchase price of each title and a tabulation of the number of copies of each title which had to be sold to retire its related note (ranging from 311,000 to 1,900,000 copies), exclusive of interest. [21]
The Offering Memorandum warned investors about the competitive nature of the book publishing business by stating: In excess of 43,000 books were published in the United States in 1977. Approximately 13,000 of these books were paperbacks of which in excess of 1,800 were mass market paperbacks. Many of these books receive little, if any, promotion or review by literary critics, thereby reducing the possibility of financial success for such books. There are many book publishers and distributors which possess substantial financial resources, large and experienced staffs, and, doubtless, ownership of substantially more literary properties than [Arts].
To assist the reader in evaluating this information the Offering Memorandum explained that: Only a small percentage of books have such successful *470 soft cover book sales and the number of [copies] required to be sold to pay off the purchase money indebtedness in each case exceeds the industry average of sales of such books. No representation or assurance can be given as to the number of [copies], if any, embodying each work which may be sold. * * *
The Offering Memorandum and Offering Summary did not contain any projection of income, expenses, net income, or cash flow, which might be realized from sales or on the limited partners' investment. The Offering Memorandum disclosed that Arts would pay Bromwell a $ 10,000 origination fee and organizational expenses of $ 37,500, and that Madison would realize a profit of between $ 335,000 and $ 470,000 on its sale to Arts. In addition, as annual management compensation, Arts agreed to pay petitioner 3 percent of the cash flow until the limited partners were credited with revenues equaling their investment. Afterward, petitioner was entitled to 20 percent of the cash flow. Petitioner, as general partner of Arts, maintained a separate bank account for Arts, maintained books and records, and timely filed Arts' partnership income tax returns. On its 1979 Partnership Income Tax *471 Return, Arts reported: Gross receipts
$ 307,000   Printing Expense
(353,000)
Depreciation
(1,368,778)
Amortization
(7,250)
Other Deductions
(1,860)
Ordinary Loss $ (1,423,888)
For the years 1980 through 1986, Arts reported the following gross receipts, deductions, and losses: GROSS
TOTAL
YEAR
RECEIPTS
DEDUCTIONS
LOSS
1980
868,482 3,205,403
(2,336,921)
1981
352,175 2,237,475
(1,885,300)
1982
61,414 1,527,718
(1,466,304)
1983
22,853 1,181,295
(1,158,442)
1984
384 900,881
(900,497)
1985
565 904,007
(903,442)
1986
(188)
871,463
(871,651)
Expert Opinions
Madison retained several literary appraisers prior to Arts' purchase of the 23 titles. However, they rendered opinion letters dated April 12, 1979 and April 17, 1979, dates subsequent to Madison's purchase from Gallen and Kensington. These letters recited the author's expertise in the field, described the subject of each title, listed the purchase price, stated the number of copies of that title that would have to be sold to recoup its cost, [22] and opined that revenues from the exploitation of that title would "at least meet the purchase price" and, "in *472 fact, may well exceed it after deductions of all costs" under the services agreements. This language had been written by Madison and adopted virtually verbatim by the appraisers. These opinion letters did not provide any representation of fair market value, or analysis of gross sales, publishing costs, cash flow, or net income expected to be realized from the title. Further, the Offering Memorandum, referring to (but not including) these opinions, cautioned that they were "estimates only" and could not "be regarded as definitive with respect to the relationship between the fair market value of the [titles] and the purchase price thereof." Petitioner also submitted an expert's report prepared by DeWitt C. Baker (hereinafter Baker), dated January 29, 1986, evaluating the 23 titles, as of March 1979, as a package rather than individually. Baker computed what portion of the notes would have to be amortized *473 before the limited partners received back their cash investment, as well as two to three times their cash investment. However, Baker did not include interest payments required on the notes when making his computations. In this regard, he prepared a table showing the sales level (in copies) required for each title to return its cash investment. [23] Baker concluded that "the purchase price paid in the aggregate by Literary Arts Associates for the physical properties * * * represents the fair market value of said properties at the time of their acquisition." Nevertheless, Baker testified that of the 2,000 to 3,000 mass market paperback books published in 1978, only 89 sold over one million copies. Respondent submitted the expert opinions of Robert Sachs (hereinafter Sachs) and Stephen Conland (hereinafter Conland). Sachs valued the titles as of March 1979, while Conland valued them as of the month they were printed. These appraisers valued the manuscripts individually by computing the net profit *474 expected from each of them. This involved estimating revenues by projecting sales based on the performance of the publisher and distributor, [24] and discounting the resulting profit for the risk of investment. The value of the 23 manuscripts totaled $ 143,250 in Sachs' report and $ 126,700 in Conland's report. [25] In their opinion, Arts' purchase price was between 80 to 100 times the manuscripts' fair market value, and the sales levels required to amortize the notes were 6 to 10 times higher than could reasonably be expected. OPINION Evidentiary Objections
Before we address whether petitioner is entitled to the losses, deductions, and credits at issue in this case, we must initially decide whether to sustain petitioner's evidentiary objections seeking to exclude from the record the reports and testimony of respondent's two expert witnesses, Sachs and Conland. Petitioner *475 bases its objection to the admission of such evidence on the Court of Appeals for the Second Circuit's opinion in Jacobson v. Commissioner, 915 F.2d 832 (2d Cir. 1990) (hereinafter Jacobson), revg. in part and affg. in part T.C. Memo. 1988-341 (a case decided after we entered our decision in Leger). In Jacobson, the Court of Appeals for the Second Circuit reversed a decision of this Court which held that the acquisition of a motion picture by a limited partnership was a sham transaction that should be ignored for Federal tax purposes. It determined that we had erred in basing our findings in part upon our own subjective evaluation of the potential profitability of the motion picture. The Court of Appeals for the Second Circuit explained: We reject this judicial version of the Siskel and Ebert "thumbs up, thumbs down" approach to film evaluation. * * * the court is not to reject profit motive because of subjective dislike of a film's style or disapproval of a film's theme. It is not for courts to predict what themes are geared to popular success. [Id. at 839.]
Relying *476 upon Jacobson, petitioner urges us to find that Sach's and Conland's appraisal reports and testimony were "subjective" and thus inadmissible. However, the Court of Appeals for the Second Circuit recently rejected such a contention in In re MDL-731-Tax Refund Litig. v. United States, 989 F.2d 1290 (2d Cir. 1993) (hereinafter In re Tax Refund), a case addressing book publishing promotions patterned on those involved here. There, the taxpayers asked the Court of Appeals for the Second Circuit to exclude expert evidence regarding the market value of books because they contended it was "subjective", citing Jacobson as authority for their position. The Court of Appeals for the Second Circuit distinguished Jacobson, where it refused to accept the trial judge's own subjective evaluation, from the expert evidence the taxpayers sought to exclude in In re Tax Refund. It explained that nothing in Jacobson precluded the trier of fact from evaluating expert testimony even though it contained subjective elements, pointing out that: the appraisers' valuations of the Properties may contain an irreducible subjective element. The appraisal *477 of any property that does not have frequently traded identical substitutes will necessarily be guided by both objective and subjective considerations. * * * [Id. at 1299.]
So, too, in this case, we may consider the expert evidence offered by respondent. The experts' reports and testimony are based, not upon their personal likes and dislikes, but rather upon their expertise in the book publishing industry. Accordingly, we may evaluate the expert evidence, notwithstanding that such evidence may contain "an irreducible subjective element". Next, petitioner argues that we should exclude respondent's expert evidence because Cohen and the publishers arrived at a purchase price for the titles through arm's-length negotiations. In support of his argument, petitioner again relies on Jacobson, where the Court of Appeals for the Second Circuit in turn cited Sheid v. Commissioner, T.C. Memo. 1985-402, together with the parenthetical "purchase as a result of arm's-length bargaining fixes fair market value; appraisal testimony arguably irrelevant." Jacobson v. Commissioner, supra at 838. *478 From this language, petitioner contends that respondent's appraisal evidence should not be admitted because it has submitted evidence of arm's-length negotiations sufficient to prove that the price Arts paid for its titles reflected their fair market value. Again, the Court of Appeals for the Second Circuit has already rejected petitioner's contention in In re Tax Refund. There, the taxpayers asked the court to hold that their evidence of a negotiated price for the books made any expert testimony regarding the market value of those titles irrelevant. The Court of Appeals for the Second Circuit refused, reasoning that "The pertinent valuation should, like any question of fact, be determined on all available evidence," and that if the trier of fact "determines that the negotiations were not arm's-length and informed, then it may look to the appraisal evidence as evidence of value." In re MDL-731-Tax Refund Litig. v. United States, supra at 1298. Nothing in Jacobson, therefore, supports the contention that appraisal evidence is inadmissible when there is evidence of arm's-length negotiations. Id. Accordingly, we may admit the expert *479 evidence presented by respondent. Finally, in its reply brief, petitioner argues that the Court of Appeals for the Second Circuit's opinion in In re Tax Refund does not apply to this case because at issue in In re Tax Refund was the jury's verdict that the promoters had made a "gross valuation overstatement" within the meaning of section 6700, whereas in this case we are determining whether the transaction at issue possessed economic substance. We disagree. A "gross valuation overstatement" includes a statement as to the value of any property, if the value so stated exceeds 200 percent of the amount determined to be the correct valuation, and if the value of that property is directly related to the amount of a claimed tax deduction or credit. Sec. 6700(b). Therefore, to decide whether a gross valuation overstatement exists within any factual scenario, the trier of fact must compare the stated purchase price with the fair market value of the subject property. See, e.g., United States v. Campbell, 897 F.2d 1317, 1320 (5th Cir. 1990). Indeed, In re Tax Refund involved just such a comparison. This same comparison of price to value is *480 also important in determining whether a taxpayer has a profit objective. See Soriano v. Commissioner, 90 T.C. 44, 56-57 (1988). It is also a factor in determining whether, for tax purposes, a transaction possesses economic substance. See Zirker v. Commissioner, 87 T.C. 970, 976 (1986). Therefore, in deciding the present case, one of the factors we may consider involves comparing the purchase price of the 23 titles with their fair market value. Consequently, the Court of Appeals for the Second Circuit's discussion of expert evidence in In re Tax Refund is as relevant in this case as it is in the context of a case brought under section 6700. Economic substance
Turning our attention now to the substantive issues before us, petitioner first contends that the deductions and credits it claimed are allowable because its interest in Arts possessed economic substance. In general, a transaction is effective for Federal income tax purposes only if its economic substance is consonant with its intended tax effects. Frank Lyon Co. v. United States435 U.S. 561, 573 (1978); Knetsch v. United States, 364 U.S. 361, 364 (1960); *481 Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965). That is, the transaction must have economic substance "which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax avoidance features that have meaningless labels attached". Frank Lyon Co. v. United States, supra at 583-584; see Estate of Thomas v. Commissioner, 84 T.C. 412, 432-433 (1985); Hilton v. Commissioner, 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982). In evaluating whether a transaction possesses economic substance, we look to objective factors which indicate whether the taxpayer acquired an equity interest in the property and whether the taxpayer had a reasonable opportunity for economic success. Levy v. Commissioner, 91 T.C. 838, 856 (1988); Packard v. Commissioner, 85 T.C. 397, 417 (1985). We have found the following factors to be particularly *482 important in determining whether a transaction possesses economic substance: The presence or absence of arm's-length price negotiations, Helba v. Commissioner, 87 T.C. 983, 1005-1007 (1986), affd. without published opinion 860 F.2d 1075 (3d Cir. 1988); the relationship between the sales price and fair market value, Zirker v. Commissioner, supra at 976; the structure of the financing, Helba v. Commissioner, supra at 1007-1011; whether there was a shifting of the burdens and benefits of ownership, Rose v. Commissioner, 88 T.C. 386, 410 (1987), affd. 868 F.2d 851 (6th Cir. 1989); the degree of adherence to contractual terms, Helba v. Commissioner, supra at 1007-1011; and, the reasonableness of the income projections, Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 204-207 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985). We consider each of these factors in turn. The presence or *483 absence of arm's-length negotiations
Petitioner contends that the record in this case contains sufficient evidence for us to find, not only that Cohen engaged in arm's-length negotiating to purchase the titles, but that such arm's-length negotiating established the fair market value of the properties acquired by Arts. In considering petitioner's argument, first let us specify exactly what negotiations we are evaluating. Because Cohen owned (either directly or indirectly), controlled, and operated Madison, Arts, and Bromwell, he could and did arrange the transactions between them. No negotiations, at arm's-length or otherwise, took place between those entities. On the other hand, Cohen's negotiations with Gallen and Kensington on behalf of Madison were between unrelated third parties. However, despite petitioner's argument to the contrary, the interests of these third parties were not always adverse to one another. To determine that an arm's-length transaction took place, we must find that the buyer was motivated to secure the lowest purchase price possible and, conversely, that the seller looked to obtain the highest price. Yet, it is evident that Cohen had little interest *484 in securing the lowest price for Madison. In fact, just the opposite was true. To support the tax benefits promised to Arts' limited partners, Cohen had to maximize the purchase price to provide the high tax basis needed to support the excessive depreciation deductions and investment tax credits that would be claimed by them. Cf. Patin v. Commissioner, 88 T.C. 1086, 1122 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989); Capek v. Commissioner, 86 T.C. 14, 48-49 (1986); Ferrell v. Commissioner, 90 T.C. 1154, 1186 (1988). Cohen accomplished this by having Madison give Gallen and Kensington large amounts of nonrecourse notes as part of the total purchase price, bringing the total purchase price by Madison up to $ 11,690,000. *485 Arts assumed these notes when it purchased the 23 titles for a total purchase price of $ 12,319,000. Despite the substantial prices petitioner alleges Cohen "negotiated" in tough bargaining sessions, there is little indication in this record of how Cohen arrived at the fair market value of these titles before Madison purchased them. The appraisals basically were written by Madison after the transaction had been "negotiated". Moreover, Cohen himself had read only one of the titles. In addition, when Arts made its purchase from Madison in May of 1979, the publishers had already solicited sales and printed 14 of the titles. The results of the solicitation indicated that these titles would not sell a sufficiently large number of copies to generate the income necessary to justify the prices Cohen agreed to pay for them. Had Cohen truly engaged in arm's-length negotiations on behalf of Madison, he would have taken these bleak prospects into account. On the other hand, when we focus on the cash aspect of the negotiations, it was in Cohen's interest to minimize the amount that would go to Gallen and Kensington. In this, he succeeded quite well. Madison initially paid them only $ *486 6,500 in cash upon signing the agreement, and promised to pay another $ 157,000 by the end of 1979, after Madison would have sold the properties to Arts. But when Cohen arranged the sale between Madison and Arts (that part of the transaction in which he represented both parties), Cohen structured a deal that involved a great deal of cash. Arts paid Madison $ 824,000 in cash, more than four times the cash Madison would pay Gallen and Kensington. Since Cohen's family owned Madison, all of such cash inured to his family's benefit. Thus here, as in Fox v. Commissioner, 80 T.C. 972, 1010 (1983), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984): The record is devoid of evidence showing that the purchase price * * * was in any way determined with a "true regard for the profitability of the activity." Brannen v. Commissioner, supra at 509. The negotiations were conducted only with a view toward benefiting both the promoters (in cash) and potential limited partners (in tax benefits).
For their part, Gallen and Kensington bargained for enough cash to cover the costs of their initial printing, *487 plus the profit from the sales proceeds generated by the initial and secondary printings. There is no indication, however, that they insisted upon the vastly inflated purchase prices reflected in their agreements with Madison. Having received assurances of the cash and potential profit they sought, however, Gallen and Kensington had no reason to object to artificially inflating the selling price. Flowers v. Commissioner, 80 T.C. 914, 935 n.28 (1983). We conclude, therefore, that the negotiations between the publishers and Cohen (on behalf of Madison) were not arm's-length negotiations which were "compelled or encouraged by business or regulatory realities * * * imbued with tax-independent considerations". Frank Lyon Co. v. United States, 435 U.S. at 583-584. It follows then that the acquisition agreements do not reflect the fair market value of the property purchased therein. The relationship between sales price and fair market value
The Court of Appeals for the Ninth Circuit has described an inflated purchase price as "Perhaps the most important single factor suggesting that the actual motive for the * * * *488 activities was tax avoidance rather than even speculative profit". Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 728 (9th Cir. 1986), affg. T.C. Memo. 1984-472. The importance of this factor must have been obvious to petitioner, whose burden it was to prove a close relationship between the sales price and fair market value of the titles. Yet, petitioner has completely failed to discharge that obligation. We cannot take seriously the 1979 appraisals submitted by petitioner. The language in the appraisals was largely prepared by Madison and reflected the high prices it already had paid to purchase the titles from Gallen and Kensington. Moreover, these appraisals did not undertake to determine the titles' fair market value by the use of any type of objective criteria, nor did they consider the results of the publishers' solicitation for 14 of the 23 titles here involved. Mr. Baker's appraisal was equally unhelpful. He adopted the stated purchase prices as fair market value. He considered the number of sales necessary for the investors to receive back the cash portion of their investment (without taking *489 interest into account), but did not evaluate the likelihood of achieving such sales. His report endorsed the titles using vague generalities, such as "largest sale potential", or "strong category", without specifically quantifying such terms. Respondent's experts provided far more information and analysis. Sachs and Conland valued the manuscripts individually by computing the net profit expected from each of them. [26] *490 They estimated income by projecting sales based on the performance of the publisher and distributor, [27] and they took into account the investment risk upon the resulting profit. They calculated that no Gallen title would sell more than 175,000 copies and that no Kensington title would sell more than 80,000. [28] In their opinion, Arts' purchase price was between 80 to 100 times the manuscripts' fair market value, and the sales levels required to amortize the notes were 6 to 10 times higher than could reasonably be expected. Petitioner made no serious attempt to refute those figures. Even without expert testimony, the evidence shows that the gap between Gallen's and Kensington's acquisition costs and the prices charged for the titles is untenable. The advances paid to the authors of the 23 titles totaled $ 90,500, whereas Arts' purchase price for the titles totaled $ 12,319,000. This is a markup of some 12,000 percent, most of it in the form of the enormous nonrecourse notes. The authors, of course, received the right to participate in future profits, and some costs were incurred in transforming the manuscripts into printable titles. These additional costs, however, would amount to only a small fraction of $ 12,319,000, and would not justify the huge markups involved here. See Seaman v. Commissioner, 84 T.C. 564, 593-594 (1985); Surloff v. Commissioner, 81 T.C. 210, 235-236 (1983). On brief, petitioner renews its argument that respondent's experts were too subjective, that is, that *491 their values reflected their personal tastes rather than objective considerations. However, like the Court of Appeals for the Second Circuit in In re Tax Refund, we are not troubled by the fact that the experts' valuation may contain a subjective element. Further, notwithstanding any subjective element, respondent's experts' reports were far more objective and far more convincing than those offered by petitioner. Moreover, petitioner's contention misses the point. It was petitioner's burden to establish a proximity between the $ 12,319,000 purchase price for the titles and their actual fair market value. Nonetheless, petitioner made no serious attempt to meet its burden of showing that the purchase price reflected such value. Such attempts as it did make contained little in the way of objective analysis. In conclusion, we find that petitioner has not submitted evidence regarding the fair market value of the titles which materially differs from such evidence in Leger. Consequently, for the reasons already stated in Leger v. Commissioner, T.C. Memo. 1987-146, we again conclude that the total value of all 23 titles was less than one million *492 dollars -- or less than one-twelfth of the total of their stated purchase prices. The structure of the financing
The greatest portion of the purchase price of the titles ($ 11,495,000 out of a total of $ 12,319,000) was financed by nonrecourse notes. Courts have found that a transaction with large amounts of debt (especially of the nonrecourse variety) is an important characteristic of a program that lacks economic substance, especially when, as a practical matter, there is little possibility that the notes will ever be paid. See, e.g., Waddell v. Commissioner, 86 T.C. 848, 902 (1986), affd. per curiam 841 F.2d 264 (9th Cir. 1988); Elliott v. Commissioner, 84 T.C. at 238; Estate of Baron v. Commissioner, 83 T.C. 542, 552-553 (1984), affd. 798 F.2d 65 (2d Cir. 1986). In this case, it is abundantly clear that the nonrecourse notes Madison gave Gallen and Kensington would never be paid. For Arts to pay off the 23 notes (not including interest), eachKensington title would have to sell over 311,000 copies, while eachGallen *493 title would have to sell over 1,100,000 copies. (Obviously, these numbers would be even higher if interest on the notes had been taken into account.) Yet, in 1979, Gallen's best selling title sold approximately 250,000 copies while Kensington had no title selling more than 400,000 copies. [29] In the paperback industry as a whole, sales of paperbacks in the numbers required to pay off the notes were extremely rare. Even petitioner's expert admitted that of the two to three thousand paperbacks published in 1978, only 89 sold over one million copies and these bestsellers included reprints of known bestsellers previously distributed in hardcover. *494 In fact, it seems that the promoters themselves harbored no serious notions that the notes would be paid off. The Offering Memorandum warned investors of the competitive nature of the book publishing business by stating: In excess of 43,000 books were published in the United States in 1977. Approximately 13,000 of these books were paperbacks of which in excess of 1,800 were mass market paperbacks. Many of these books receive little, if any, promotion or review by literary critics, thereby reducing the possibility of financial success for such books. There are many book publishers and distributors which possess substantial financial resources, large and experienced staffs, and, doubtless, ownership of substantially more literary properties than [Arts].
In sum, the unrealistically large sales needed to pay off the notes show that the amount financed was largely inconsistent with any net revenue the title might have produced. Given the nonrecourse nature of the debt, the fact that the titles securing the debt had a fair market value of no more than one million dollars, and that it was unlikely that sufficient revenues to pay off the debt were likely to be produced, we *495 conclude that this purported financing was largely inconsistent with economic reality. Shifting of the burdens and benefits of ownership
The transaction between Madison (and thereafter Arts) was framed so that the publishers never relinquished the burdens and benefits of owning the titles. Gallen and Kensington acquired and edited the manuscripts, designed the cover, and then, together with Confucian, Hercules, Dell, and Kable, promoted, printed, and distributed the titles. Gallen and Kensington also retained the benefits of such ownership. Their arrangements with Madison and its assignee Arts provided that the publishers (or their subsidiaries) were entitled to cash, plus fees, under the services agreements for producing and selling the books, plus note payments equal to 60 percent of the gross proceeds from those sales. The net effect was that the publishers would retain all the gross proceeds on the initial and secondary sales. On the other hand, other than claiming ownership, Madison (and thereafter Arts) had little to do with controlling, publishing, or promoting the titles. They merely paid relatively small amounts of cash to the publishers for bare ownership rights; *496 their primary interest was in establishing a basis for claiming the inflated tax benefits allegedly generated by their ownership of the titles. Adherence to contractual terms
There is no indication in the record that the parties to the various contracts failed to abide by the terms of their respective agreements. However, as we have already concluded, the contracts were not arrived at by adverse parties participating in arm's-length negotiations. Rather, they were drafted to provide a structure for claiming tax benefits. Compliance with contrived contractual arrangements does nothing to suggest that the program possessed economic substance. Reasonableness of the income projections
We think it obvious that promoters of a program imbued with economic substance would, in their Offering Memorandum, try to demonstrate to a prospective investor that the program was likely to be profitable by including income projections prepared based on stated and reasonable assumptions. Yet, here the Offering Memorandum contained only generalized assertions that the titles would generate sufficient income to repay the notes. The only specific discussion in the Offering Memorandum about *497 the financial aspects of the transaction was directed to anticipated tax benefits. Moreover, the vague opinions of economic value provided in petitioner's experts' reports did not indicate the fair market value of the titles, nor did they make any projections of sales or profits. Instead, they merely recited that the revenues, net of costs under the services agreements, would equal or exceed the purchase price. Even in making these generalized conclusions, the substantial effect that the interest payable on the notes would have had upon profitability was overlooked. We conclude that the absence of such projections strongly suggests that the transactions at issue lacked economic substance. Nevertheless, petitioner argues that where a transaction changes the beneficial and economic rights of the parties, that transaction must possess economic substance, citing Rosenfeld v. Commissioner, 706 F.2d 1277, 1283 (2d Cir. 1983), affg. T.C. Memo. 1983-263 (hereinafter Rosenfeld), in support of its contention. In Rosenfeld, both this Court and the Court of Appeals held that a physician, who had transferred an office building *498 into trust for the benefit of his children, could nevertheless deduct his rent for office space that he leased from that trust. In approving the claimed deductions, the Court of Appeals stated "If * * * [the parties'] legal rights and beneficial interests have changed, there is no basis for labeling a transaction a 'sham' and ignoring it for tax purposes." Id. at 1282. In so holding, the Court of Appeals, like this Court, noted four reasons for deciding that the gift-leaseback transaction at issue had effectively changed ownership of the office building for tax purposes. First, the physician relinquished control of the office building to independent trustees. Second, the rent paid for the building reflected its fair rental value. Third, the leaseback had a bona fide business purpose -- the physician needed an office. And fourth, the physician did not retain any legal or equitable rights (such as a reversionary interest) in the property. Id.
In contrast, Gallen and Kensington retained control over the property they ostensibly sold. The selling price of the titles did not reflect their fair market value. In addition, neither Madison nor Arts *499 had a valid business purpose (outside of tax considerations) for investing in an endeavor that was virtually guaranteed never to make a profit. See Leger v. Commissioner, T.C. Memo. 1987-146. Finally, the publishers retained a security interest in the titles; in the event of the purchasers' default on the notes, they could reclaim the titles, which served as the only security for the payment of those notes. Based on these differing factual characteristics, Rosenfeld is simply not applicable here. We acknowledge that documents were executed transferring legal ownership of the titles from Madison to Arts. Such formalisms, however, do not preclude us from investigating the substance of the transaction. See Knetsch v. United States, 364 U.S. at 365-367; Muserlian v. Commissioner, 932 F.2d 109, 111 (2d Cir. 1991), affg. T.C. Memo. 1989-493; Hoffman Motors Corp. v. United States, 473 F.2d 254, 257 (2d Cir. 1973); Hulter v. Commissioner, 91 T.C. 371, 387-388 (1988). We will not give effect to a series *500 of transactions, even though they actually take place, when the transactions have no business or profit-making function other than obtaining tax benefits. In such cases, we disregard the transactions for tax purposes, "though all the proceedings [have] their usual effect." Helvering v. Gregory, 69 F.2d 809, 811 (2d Cir. 1934), affd. 293 U.S. 465 (1935); see Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). Accordingly, because the objective facts of this case reveal no credible basis for finding that the transactions at issue possessed economic substance, we hold that they lack their intended effect for Federal income tax purposes. Frank Lyon Co. v. United States, 435 U.S. at 573; Knetsch v. United States, supra at 366; James v. Commissioner, 87 T.C. 905, 918 (1986), affd. 899 F.2d 905 (10th Cir. 1990). [30]
*501 On brief, the parties have also presented a number of other arguments addressing whether petitioner is entitled to the deductions and credits afforded by its participation as a limited partner in Arts, primarily those directed toward whether petitioner possessed an actual and honest objective of making a profit from its investment in Arts. We acknowledge that a profit objective is necessary for the allowance of the deductions and credits at issue. However, since we have held that the transactions in issue lacked economic substance, and therefore such deductions and credits are not allowable, it is unnecessary for us to address petitioner's profit objective because "it is well established that a subjective profit motive can not save a transaction that objectively lacks economic substance". Gardner v. Commissioner, 954 F.2d 836, 839 (2d Cir. 1992), affg. T.C. Memo. 1988-570. Interest Deductions
Respondent disallowed an interest expense deduction of $ 310,650 claimed by petitioner for its taxable year 1979. The deduction arose in connection with the nonrecourse promissory notes given as part of the purchase of the *502 titles by Madison to Gallen and Kensington, and subsequently assumed by Arts. The parties have stipulated that, if we find that the nonrecourse promissory notes are not includable in the tax basis of the titles for purposes of computing depreciation, the interest is not deductible. Under sections 1011 and 1012, the tax basis of an asset is generally the same as its cost. However, where the purchase price and the principal amount of a nonrecourse note have been shown to unreasonably exceed an asset's fair market value, the courts have excluded from basis the amount of the nonrecourse indebtedness used to acquire the asset. Under such circumstances, we have reasoned that no genuine indebtedness existed since there was no economic incentive to repay the debt. Coleman v. Commissioner, 87 T.C. 178, 209 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987); Herrick v. Commissioner, 85 T.C. 237, 260 (1985). Here, Arts purchased 23 titles for $ 12,319,000 of which $ 11,495,000 was "paid" by Arts' assumption of Madison's nonrecourse debt. Since we have already found that the fair market *503 value of the 23 titles purchased by Arts was less than one million dollars, it follows that the nonrecourse debt Arts assumed was not genuine indebtedness and, consequently, petitioner may not deduct its share of interest on such "debt". Knetsch v. United States, supra at 365-367; Muserlian v. Commissioner, supra at 113; United States v. Philatelic Leasing, Ltd., 794 F.2d 781, 786 (2d Cir. 1986). Nevertheless, petitioner argues that, because the notes had specific due dates and the payments were made upon the principal balance, such notes should be considered part of the payment for the titles, citing Jackson v. Commissioner, 86 T.C. 492 (1986), affd. 864 F.2d 1521 (10th Cir. 1989), in support thereof. As we noted in Jackson, however, there must be economic substance supporting the stated amount of the debt for such debt to constitute payment. Id.. at 521. Because we have already decided that there was no economic substance to Arts' purchase of the titles, Jackson does not aid petitioner's *504 cause. See Driggs v. Commissioner, 87 T.C. 759, 772-773 (1986). Petitioner also argues that, in this case, only prepayment of the note was dependent upon sales; after a certain date, the note would be payable regardless of sales. On this basis, it attempts to distinguish Estate of Baron v. Commissioner, 83 T.C. at 549-550, arguing that the debt in that case was payable only from proceeds and the issuer had no obligation to promote the purchased property. However, petitioner's argument ignores the fact that Arts' partners were not personally liable on the note and the titles themselves were the only security for the note. Because the amount of the note far exceeded the value of the titles, there was no economic incentive for anyone to make further payments. Estate of Franklin v. Commissioner, 544 F.2d 1045, 1049 (9th Cir. 1977), affg. 64 T.C. 752 (1975); see Elliott v. Commissioner, 84 T.C. at 246-247. It follows then that the notes did not constitute a genuine indebtedness and, therefore, respondent properly disallowed the *505 concomitant interest. Addition to Tax - Section 6653
Respondent determined that petitioner is liable for the addition to tax under section 6653(a), for negligence or intentional disregard of the rules or regulations. Negligence has been defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner bears the burden of proving that the addition to tax should not be imposed. Rule 142(a); Jim Burch & Associates, Inc. v. Commissioner, 76 T.C. 202, 208 (1981). Petitioner makes several arguments as to why the addition to tax for negligence should not be imposed. First, petitioner contends that it reported the correct amount of tax on its Federal income tax returns. However, since we have held that petitioner claimed deductions and credits that were not allowable because the transactions upon which they were based lacked economic substance, in fact, *506 petitioner did understate the amount of its taxes. Next, petitioner argues that, because it organized and operated Arts with the advice of attorneys and accountants, obtained a tax opinion in connection with its promotion of Arts, and relied on these professionals in good faith, the imposition of the addition to tax for negligence is precluded. Although it is true that reliance on the advice of professionals may defeat a finding of negligence, to absolve the taxpayer of the negligence addition to tax, such reliance must be reasonable. Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976). We do not construe this record as petitioner would have us do. To the contrary, Cohen, who controlled petitioner, was an intelligent and savvy individual, experienced in the world of business. He caused petitioner to formulate and promote the Bromwell programs, a series of tax sheltered offerings. See Elliott v. Commissioner, supra; Cashman v. Commissioner, T.C. Memo. 1989-533, affd. 930 F.2d 26 (9th Cir. 1991); Leger v. Commissioner, T.C. Memo. 1987-146; *507 Ziegler v. Commissioner, T.C. Memo. 1984-620. One such offering was Arts, a program which we have found did not even approach being an enterprise that was "compelled or encouraged by business or regulatory realities" but rather was an enterprise "shaped solely by tax-avoidance features that have meaningless labels attached". Frank Lyon Co. v. United States, 435 U.S. at 583-584. Given Cohen's extensive experience in this area of business and his role in the Bromwell programs, we cannot accept petitioner's argument that he relied upon the tax opinion included in the Offering Memorandum. This is especially true in view of the fact that the tax opinion contained such carefully circumscribed "non-advice" as the following: Limited Partners should be aware that the Service has indicated that such transactions will be subject to particular scrutiny, and that no assurance can be given that a challenge by the Service will not be successful in any given case.
Rather, we believe that Cohen was the individual who obtained the tax opinion from legal counsel for inclusion in the Offering Memorandum. Through his discussions *508 with such counsel, he must not only have known of the tax risks involved but, ignoring these risks, went on to profit from the promise of tax benefits to others. Under these circumstances, we find that the deductions and credits claimed by petitioner, a corporation controlled by Cohen, were the result of its negligent or intentional disregard of the rules or regulations, and the additions under section 6653(a) were properly determined. Increased Interest - Section 6621(c)
Respondent also determined that petitioner is liable for the enhanced rate of interest provided for by section 6621(c), on the grounds that petitioner made a substantial underpayment of tax attributable to a valuation overstatement. Petitioner contends that it did not make any valuation overstatement which would result in the imposition of the increased rate of interest. Section 6621(c) provides for interest on the unpaid tax at a rate equal to "120 percent of the underpayment rate" (provided for in section 6621(a)(2)), where there is a substantial underpayment of tax attributable to a tax-motivated transaction. Such a transaction includes "any valuation overstatement (within the meaning of section 6659(c))". *509 Sec. 6621(c)(3)(A)(i). Under section 6659(c), a valuation overstatement exists when "the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount" of the value or adjusted basis of that property. We have found that the fair market value of the 23 titles Arts purchased was less than one million dollars. On its income tax return, Arts claimed that the titles had a tax basis of $ 12,319,000. The amount of basis claimed by petitioner vastly exceeds the 150 percent threshold for the application of section 6621(c). Accordingly, we hold that there was a valuation overstatement within the meaning of section 6621(c), and that, therefore, the increased interest rate applies. Conclusion
Our resolution of the issues discussed above entirely disposes of the deficiencies and additions to tax at issue. Therefore, we need not examine the other arguments presented by the parties. Accordingly, and because both parties previously have made concessions, Decision will be entered under Rule 155. APPENDIX A
Gallen's and
Kensington's
Madison's Purchase Price
Title
[1]Advance Cash
Notes
1
$ 10,000
$ 10,500
$ 800,000
2
6,000 10,500
800,000
3
9,000 10,500
800,000
4
9,000 10,500
800,000
5
8,000 18,000
1,400,000
6
5,000 13,000
925,000
7
7,500 11,000
687,600
8
3,000 11,000
687,600
9
3,000 11,000
687,600
10
4,000 11,000
687,600
11
4,000 11,000
687,600
12
1,500 3,000
211,000
13
2,500 3,000
211,000
14
1,750 3,000
211,000
15
2,500 3,000
211,000
16
2,000 3,000
211,000
17
2,000 3,000
211,000
18
1,500 3,000
211,000
19
1,500 3,000
211,000
20
1,500 3,000
211,000
21
1,500 3,000
211,000
22
1,750 3,000
211,000
23
2,000 3,000
211,000
$ 90,500
$ 164,000
$ 11,495,000
*510 APPENDIX A
Art's Purchase Price
Respondent's Value
Title
Cash
Notes
Sachs
Conland
1
$ 75,000
$ 800,000
$ 15,400
$ 12,000
2
75,000
800,000
13,200
14,000
3
75,000
800,000
15,400
13,000
4
75,000
800,000
15,400
13,500
5
100,000
1,400,000
13,200
5,000
6
70,000
925,000
10,000
17,000
7
32,400
687,600
7,500
6,000
8
32,400
687,600
4,800
6,500
9
32,400
687,600
5,200
8,500
10
32,400
687,600
4,800
8,500
11
32,400
687,600
7,100
7,500
12
16,000
211,000
3,000
1,500
13
16,000
211,000
3,750
3,000
14
16,000
211,000
2,600
-0-
15
16,000
211,000
3,000
500
16
16,000
211,000
2,600
1,500
17
16,000
211,000
2,200
1,200
18
16,000
211,000
2,600
1,200
19
16,000
211,000
1,900
1,200
20
16,000
211,000
2,200
1,200
21
16,000
211,000
2,200
1,000
22
16,000
211,000
2,600
1,500
23
16,000
211,000
2,600
1,400
$ 824,000
$ 11,495,000
$ 143,250
$ 126,700
*511 APPENDIX B
Per Offering
Copies Each
Memorandum
Title Required
Copies Required
To Return Its
Date of
To Pay Off Note
Cash Investment
First
TITLE
(Without Interest)
(Per Baker)
Printing
1
1,100,000
483,333
7/79
2
1,100,000
483,333
8/79
3
1,100,000
483,333
8/79
4
1,100,000
483,333
9/79
5
1,900,000
594,000
6/80
6
1,350,000
511,111
5/79
7
765,000
229,600
9/79
8
885,000
243,363
10/79
9
850,000
243,363
8/79
10
765,000
229,600
10/79
11
850,000
243,363
5/79
12
311,000
110,796
6/79
13
311,000
115,796
9/79
14
367,000
115,796
8/79
15
367,000
117,051
6/79
16
367,000
122,051
9/79
17
367,000
122,051
3/79
18
367,000
122,051
3/79
19
367,000
122,051
3/79
20
367,000
122,051
4/79
21
367,000
122,051
4/79
22
367,000
122,051
4/79
23
367,000
122,051
4/79
16,057,000
5,669,834
Copies
Printed
Respondent's Sales Projections
and (Number of Copies)
TITLE
Distributed
Sachs
Conland
1
238,759
175,000
90,000
2
210,825
150,000
90,000
3
210,600
175,000
90,000
4
159,150
175,000
90,000
5
131,895
150,000
75,000
6
130,500
125,000
100,000
7
65,621
80,000
50,000
8
30,096
60,000
50,000
9
50,097
55,000
50,000
10
59,672
50,000
50,000
11
67,349
75,000
50,000
12
43,887
35,000
20,000
13
30,254
40,000
22,500
14
30,563
35,000
17,500
15
30,138
40,000
20,000
16
35,636
35,00
20,000
17
38,856
30,000
20,000
18
35,539
35,000
20,000
19
35,709
25,000
20,000
20
30,096
30,000
20,000
21
30,067
30,000
20,000
22
30,101
35,000
20,000
23
30,223
35,000
20,000
1,752,633
1,675,000
1,025,000
*512 Footnotes
1. Unless otherwise specified, all section references are to the Internal Revenue Code of 1986. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner filed its Federal income tax returns based on fiscal years ending on October 31st. Hereinafter, all references to petitioner's taxable years of 1978, 1979, and 1980 shall refer to petitioner's fiscal years ending October 31, 1978, October 31, 1979, and October 31, 1980, respectively.↩
3. The parties have settled the following issues: (1) For its taxable year 1978, petitioner conceded that respondent's disallowance of $ 3,493 of taxes is correct; (2) for the taxable years 1978 and 1979, a part of respondent's proposed adjustments relate to contributions, which were statutory adjustments generated by other adjustments and, consequently, the correct amount of petitioner's contribution deductions will be determined based upon our resolution of other issues in this case; and (3) for the taxable year 1980, respondent disallowed $ 635,300 in printing expense, but has conceded $ 579,300 of this amount. The remaining $ 56,000 remains at issue.↩
4. The term "mass market paperback" refers to rack-sized paperback books. They are usually marketed by national magazine distributors and independent wholesalers to various retail establishments. They are distinguishable from non-rack-sized "trade" paperback books that generally are marketed through bookstores.↩
5. All subsequent reference to these titles will be by number.↩
6. Hardcover publications subsequently distributed as paperbacks are known as "reprints".↩
7. A "manuscript" or "work" is the raw product submitted to a publisher by an author as distinguished from a "title" which is the finished product ready for printing.↩
8. See appendix A for the exact amount of the advance each author received.↩
9. The record does not reflect on what date this agreement was assigned to Gallen.↩
10. See appendix A for the exact amount each author received.↩
11. The amounts of the notes were $ 800,000 for each of titles 1-4; $ 1,400,000 for title 5, and $ 925,000 for title 6. See appendix A.↩
12. The amounts of the notes were $ 687,600 for each of titles 7-11; and $ 211,000 for each of titles 12-23. See appendix A.↩
13. The average life of a mass market paperback is less than 1 year.↩
14. Confucian guaranteed an initial printing of 150,000 for titles 1-5 and 200,000 for book 6; Kensington guaranteed an initial printing of: 100,000 copies for titles 7-11; 40,000 copies for titles 12 and 15-23; 45,000 copies for title 13; and 35,000 copies for title 14.↩
15. Contracts between Dell and Kable as distributors and Gallen and Kensington as publishers actually date back to 1978 and 1974 respectively. No evidence was produced to show any written contractual obligations between Confucian and Dell or Hercules and Kable.↩
16. The fee varied between $ 8,000 and $ 42,000 on initial sales. The rate then varied between $ .32 and $ .42 per copy on secondary sales, and varied between $ .133 and $ .175 for all copies sold thereafter. For example, for title 9, Madison agreed to pay $ 19,000 for the first 22,100 copies sold, $ .377 for each of the next 87,900 copies sold, and $ .152 for each copy sold thereafter.↩
17. The payment of $ 2,000 per title was part of the consideration.↩
18. See appendix B for the date each title was first printed and the number of copies printed and distributed.↩
19. The Offering Summary explained: "4+ to 1 EQUIVALENT WRITE-OFFS IN 1979, AND 1 TO 1↩ IN 1980."
20. The Offering Summary explained that: While recapture exists in a technical sense due to the possibility of "forgiven debt", there are corresponding offsets predicated on accrued unused depreciation, thereby avoiding any future tax liabilities. Tax credits on the other hand are not subject to recapture -- see Tax Opinion in memorandum * * *.↩
21. See appendix B.↩
22. The appraisers received these amounts from Madison. They are the same as those listed in the Offering Memorandum.↩
23. See appendix B.↩
24. See appendix B for projected sales in copies.↩
25. See appendix A for Sach's and Conland's valuations of each of the 23 titles.↩
26. Sachs valued the titles as of March 1979, while Conland valued them as of the month they were printed.↩
27. See appendix B for projected sales in copies.↩
28. See appendix A for Sach's and Conland's valuations of the 23 titles.↩
29. Petitioner contends that these figures are irrelevant, because they were not available when petitioner purchased the titles in 1979. However, this contention ignores the point that it was petitioner's obligation to produce evidence to prove that the notes were likely to be paid and its publishers' past success in selling mass market paperbacks certainly is an important factor to consider in evaluating their chance of succeeding in a comparable transaction. Rule 142(a).↩
30. On its Federal income tax return, Arts reported losses of many millions of dollars for 1980 through 1986. Petitioner argues that use of the figures showing the post-acquisition performance of Arts constitutes impermissible hindsight in evaluating Arts' prospects as of 1979. We do not recite these figures for purposes of deciding this case by hindsight. Instead, we have set them forth to show that subsequent events are consistent with our evaluation that the Arts' transaction lacked economic substance during the years at issue. See Levin v. Commissioner, 832 F.2d 403, 406 n.3 (7th Cir. 1987), affg. 87 T.C. 698↩ (1986).
1. In addition, for every title except number 11, Gallen and Kensington agreed to pay royalties of 6 percent on the net retail sales of the first 150,000 copies and 8 percent on the net retail sales of all additional copies. For title 11, the royal percentages at these levels were 8 and 10 percent.↩